[Crim. No. 102. Third Appellate District.—November 20, 1909.]

## THE PEOPLE, Respondent, v. E. S. ROWLAND, Appellant.

CRIMINAL LAW—EMBEZZLEMENT—CORPUS DELICTI—ADMISSIONS AND CONFESSIONS—DEGREE OF PROOF.—Though the confession or extra-judicial admissions of a defendant charged with a particular crime cannot be considered for the purpose of proving the *corpus delicti,* or the elements necessary to constitute the crime with which he is charged, yet this rule does not require plenary proof or proof beyond a reasonable doubt of the *corpus delicti* before admissions or a confession of the defendant may be received and considered as evidence.

ID.—CORPUS DELICTI OF EMBEZZLEMENT—SUFFICIENCY OF INDEPENDENT PROOF.—Where the defendant is charged with embezzlement of a

particular fund in a bank of which he is secretary and cashier, upon which a check was drawn by a debtor of the bank to pay a loan amounting to $1,000, and the evidence shows that the transaction was personally conducted by defendant, and that he withheld the usual tag which would result in a record thereof, and that no record was ever made, but that the paid loan was left by defendant on the books as outstanding, and that there was a general shortage of $100,000 by defendant when the bank commissioner closed the bank, the *corpus delicti* of the particular offense charged was sufficiently proved.

ID.—CHECK ON GENERAL DEPOSIT—EMBEZZLEMENT OF CASH SUM.— A check drawn against the general deposit of money in the bank by a debtor of the bank entitled to draw a check thereon, to pay the debt, is the equivalent of payment in cash, and the creation of a shortage in such cash to the extent of the check constituted the embezzlement of the cash sum of $1,000, represented by the check.

ID.—SPECIFIC PURPOSE OF DEFENDANT IMMATERIAL—FRAUDULENT SECRETION OF MONEY.—The fraudulent secretion of the money with intent to appropriate it to the use of the defendant constituted embezzlement; and it is immaterial whether he actually drew the cash on the day on which the check was drawn, or used the shortage of that day to cover up previous defalcations to the extent of the embezzlement which was committed on that day.

ID.—TIME OF USE OF MONEY.—Under section 514 of the Penal Code, and under the allegations of the indictment, it is immaterial when before the filing of the indictment the money embezzled was actually used, except in so far as the question of time might be affected by the statute of limitations.

ID.—CORPUS DELICTI—DEFENDANT'S CONNECTION WITH CRIME.—Though the general rule is that mere proof of defendant's connection with the crime is not sufficient to establish the *corpus delicti*, and it is not necessary in order to establish the essential elements of the crime to prove defendant's connection with it, yet such rule does not go so far as to exclude, in showing the *corpus delicti*, proof of defendant's connection with the crime, where the circumstances of the case are such that proof of the crime of necessity involves proof of his guilt, he being inseparably connected with every important circumstance indicating the *corpus delicti*.

ID.—CIRCUMSTANTIAL PROOF OF CORPUS DELICTI.—It is not essential, in establishing the *corpus delicti*, that there must be direct proof of the elements constituting the same; but it is sufficient that all of the elements constituting the crime were brought home to the knowledge of the defendant by circumstantial proof, justifying the jury in returning a verdict of guilty, irrespective of the admissions and confession of the defendant.

ID.—EVIDENCE OF GENERAL SHORTAGE.—Evidence as to the general shortage continually increasing until the bank was closed, under

the administration of defendant as cashier and secretary of the bank, of which the embezzlement in question formed a part, was competent proof tending to support the particular act of embezzlement charged, which, though not conclusive thereof, was an important circumstance tending to prove it, and to show guilty knowledge or a fraudulent intent in the crime charged, and that it was not due to mistake.

ID.—EVIDENCE OF TAGS AND ENTRIES BY BOOKKEEPER UNDER DEFENDANT'S DIRECTION.—The evidence of the bookkeeper as to the tags and entries made in the books under the direction of the defendant was admissible, as tending to show defendant's knowledge as to the condition of the books and of the shortage indicated therein.

ID.—EVIDENCE OF GAMBLING HABITS OF DEFENDANT.—Evidence that during the period of the transactions leading to the general shortage, the defendant was engaged in stock gambling on a very extensive scale, and that the books of the county assessor showed comparatively little property assessed in his name, was competent, as tending to show that defendant used the bank's money for private speculation, and thus caused the enormous deficiency in the cash accounts of the institution.

ID.—REQUESTED INSTRUCTIONS—RIGHT TO BORROW MONEY—ABSENCE OF EVIDENCE.—The court properly refused requested instructions relative to the right of defendant to borrow the money alleged to have been embezzled, where there is no evidence justifying such instructions.

ID.—REQUESTS EMBODIED IN CHARGE.—The court properly refused requested instructions which were substantially embodied in the charge given by the court.

ID.—ABSTRACT INSTRUCTION NOT PREJUDICIAL — "CRIMINAL NEGLIGENCE"—INSTRUCTION AS TO FELONIOUS INTENT AS TO ACT CHARGED. An abstract instruction as to crime involving "the union of act and intent, or criminal negligence," was not prejudicial, where no "criminal negligence" was involved, and where the court properly instructed the jury as to the necessity of proof of a fraudulent and felonious intent as to the specific act charged in the indictment before defendant can be convicted.

APPEAL from a judgment of the Superior Court of Sonoma County, and from an order denying a new trial. Emmett Seawell, Judge.

The facts are stated in the opinion of the court.

Thomas J. Geary, for Appellant.

U. S. Webb, Attorney General, and Clarence F. Lea, District Attorney, for Respondent.

HART, J.—Under an indictment charging him with the crime of embezzlement, in the alleged felonious and fraudulent appropriation to his own use of the sum of $1,036.15, the money of the bank of Healdsburg, the defendant was convicted by a jury, and by the court sentenced therefor to a term of six years in the state prison.

This appeal is from the judgment of conviction and from the order of the court declining to grant defendant's motion for a new trial.

The defendant had been for many years secretary and cashier of the bank of Healdsburg, Sonoma county. On the third day of December, 1908, W. C. Watson, state bank commissioner, having in his official capacity investigated the affairs of the bank, discovered a large shortage in the cash accounts, and thereupon ordered the institution closed to business, pending further investigation. The amount which it is claimed that the shortage represented exceeded the sum of $100,000. The charge in the indictment, however, relates to a transaction involving the sum of $1,000, and occurring on the seventh day of May, 1908, so it is alleged. It appears that on that date one Robert G. Cook paid to the bank a note calling for the sum of $1,000, together with interest accruing thereon, amounting to $36.15. This money had been borrowed from the bank by the firm of Cook & Passalacqua in the year 1907, and the payment of the sum due on said note was made in the form of a check on said bank, Cook & Passalacqua then having sufficient funds in the bank to satisfy the note. The check was placed on the "file" used by the bank for such purpose by the party or official of the institution to whom it was delivered, and later an entry in the proper book made of the receipt thereof.

Appellant first claims and declares that there was introduced at the trial absolutely no evidence, either direct or circumstantial, showing that he embezzled any money from the bank of Healdsburg on the day alleged in the indictment; that, secondly, the court made erroneous rulings in the admission of evidence and that said rulings were prejudicial to his substantial rights, and, lastly, that, in its charge to the jury, the court, in several instances, committed vital errors and thus misdirected, to his prejudice, the jury upon questions of law.

The record on this appeal contains an extended synopsis of the testimony given at the trial, but we do not feel called upon to present here anything like a detailed statement of the evidence, it being sufficient, in our opinion, to refer in a general way only to the facts.

1. The contention of the appellant is that there is no evidence of any nature whatsoever, except that of a general shortage, which proves, or tends to prove, to the required degree, that the specific offense charged was committed by the defendant, or, in fact, that there is no evidence showing that said offense or any other crime was committed by the defendant, or at all, except the alleged confession of the accused of the existence of a general shortage at the time the bank commissioner investigated the affairs of the bank and discovered that something was wrong in the cash accounts thereof. This contention involves, obviously, the claim that the *corpus delicti* was not shown by evidence independent of that of the confession.

It is, of course, a well-established rule of law that the confession or extrajudicial admissions of a party accused of crime cannot be considered for the purpose of proving the *corpus delicti*, or, in other words, of proving the elements necessary to constitute the crime with which he is charged. (See *People* v. *Tapia*, 131 Cal. 651, [63 Pac. 1001]; *People* v. *Jones*, 123 Cal. 65, [55 Cal. 698]; *People* v. *Eldridge*, 3 Cal. App. 648, [86 Pac. 832].) But this rule has never been so far extended in its scope or application as to require the elements or the body of the crime to be proved beyond a reasonable doubt before the admissions or confessions may be received and considered as evidence. As is said in *People* v. *Jones*, 123 Cal. 68, [55 Pac. 700]: "As to the degree of evidence required to show criminal agency [that is, the cause of the facts constituting the *corpus delicti*], a distinction must be taken between the evidence which upon the whole case would justify a conviction, and that degree of proof of criminal agency in the burning of the buildings for the purpose of letting in evidence of the confessions or admissions of the defendant. To justify a conviction, the jury must be satisfied beyond a reasonable doubt of the existence of every fact necessary to constitute the offense and to identify the defendant as the perpetrator; but *it is not necessary that the evidence should*

*be of that conclusive character in order to justify the admission of the defendant's confessions."* (Italics ours.)

In *People* v. *Ward,* 134 Cal. 306, [66 Pac. 374], the rule as thus expounded is reaffirmed, the court saying: "Nor is the other objection—'that the *corpus delicti* had not been proven'—of any validity. Proof of the *corpus delicti* does not necessarily involve or require proof that the crime was committed by the defendant, or person charged with having committed it. The general rule is, that it must first be shown; but, except in those cases where it is sought to put in evidence the confession or admission of the defendant, the order of proof is in the discretion of the court, and *even in those cases plenary proof of the corpus delicti is not always required."* (See *People* v. *Simonsen,* 107 Cal. 346, [40 Pac. 440].)

The present question here, then, is, Does the evidence in the case at bar disclose sufficient proof of the *corpus delicti,* or the specific crime charged, to have warranted the admission of the confession in evidence?

The question may be answered by a brief examination of the evidence. The record shows that these facts were proved by the evidence, presumably to the satisfaction of the jury: That, as before stated, the defendant was, for many years prior to the date of the discovery of the defalcations, the secretary and cashier of the Bank of Healdsburg; that, in that capacity, the administration of the affairs of the bank was practically under his direct and almost exclusive control; that the books of account were kept by clerks under his immediate direction; that he had the usual power vested in bank cashiers in the matter of making loans and in the performance of the numerous other duties involved in a general banking business. It may here be remarked that John Favour, the president of the bank, whose principal duties were to look after securities for loans and examining real estate upon which loans were sought from the bank, occasionally assisted the defendant in counting the cash. Further than this he had little, if anything, to do with the inside operations of the bank. But, as suggested, the evidence very clearly shows that the books of the bank, though actually kept by clerks employed therein, were under the exclusive control and supervision of the defendant, and it further appears very clearly that, under the system upon which

the defendant conducted the business of the bank, the mere counting of the cash on hand by any person other than the defendant did not necessarily open up an opportunity to such person to learn or to know whether there was in fact any shortage in the cash accounts or not. The system in vogue in the bank for the daily transaction of its business was, according to the evidence, as thus described: Whenever one of the attachés of the institution waited on a customer a tag was prepared—generally by the clerk, but sometimes by the customer himself—whereby the exact nature of the transaction was shown. If, for illustration, money was paid into the bank, either as a deposit or for the purpose of fully liquidating or making a payment on a loan, the transaction would be noted on a tag in such manner as to clearly indicate all the necessary information with regard thereto. This tag would, if properly disposed of, be placed on a file at the "window" at which all the transactions of the bank were customarily carried on. The tag would subsequently be taken by the bookkeeper and the transaction evidenced thereby be entered in the proper book. The accounts of the bank were balanced and the cash counted and compared with the balances as disclosed by the books at the end of each day. To facilitate the balancing of the books, a machine list of all the transactions of the day was prepared each day. The items on this machine list were compared or checked with the tags, and the balances thus reached. Thereupon, the day's transactions were accordingly entered in the books.

The evidence further shows that it was the custom of the defendant to daily examine the tags representing the transactions occurring each day and to compare and check the same with the machine list.

According to the testimony of the president of the bank, the defendant himself always kept the book known as the "Loan Register," and he and no other person invariably made a record therein of any loans that came in, "or where there was anything to be credited upon the loan register." It further appears from the evidence that the transaction forming the basis of the charge in the indictment was conducted in person by the defendant himself. Cook, as heretofore stated, delivered to the defendant a check on the bank for a sum sufficient to satisfy the note previously executed in favor of the bank by Cook & Passalacqua. It also appears

that the defendant thereupon personally canceled and delivered to Cook said note. The defendant then placed the check on file at the window and from said check the bookkeeper later in the day made an entry thereof in the personal account of Cook & Passalacqua, thus indicating the withdrawal from the bank of the sum represented by the check on account of said Cook & Passalacqua. The evidence shows that the defendant himself personally entered in the interest account the receipt of the sum of $36.15 on account of the interest due on the note of said firm of Cook & Passalacqua. The defendant, however, *failed to prepare a tag or to make any other record from which the bookkeeper could learn that the note of Cook & Passalacqua had been paid.* Nor did he otherwise give out any information to the clerks with respect to the payment of said note. It is, therefore, plainly manifest that, when the books of the bank were balanced as to that day's transactions, the note of Cook & Passalacqua, although paid and no longer an asset of the bank, remained such in the loan account of the bank. In other words, the evidence discloses that the books showed that on the seventh day of May, 1908, the sum of $1,000 had been withdrawn from the bank, but failed to show that said sum was in fact paid into the bank to liquidate the loan to Cook & Passalacqua. Of course, when the cash was counted on that day it was found to balance with the books, because the one thousand dollar note referred to was still an ostensible asset of the bank, although fictitious and false, it having been paid. And, according to the testimony of Mr. Watson, the bank commissioner, who, after the discovery that there was a shortage, made a detailed examination into the affairs of the bank and the methods of their administration by the defendant, the method by which the accused handled the transaction of which the charge in the indictment is predicated was the same as that which enabled him to use over $100,000 of the bank's funds without the knowledge of the other officers of the institution.

There are some other minor circumstances disclosed by the evidence tending to show that the transaction relating to the Cook & Passalacqua note was, so far as the defendant's part in it was concerned, dishonest and carried out with a design on his part to misuse or misapply the sum represented thereby; but we think we have given a sufficient résumé of the facts as proved to clearly demonstrate that the *corpus*

*delicti* was sufficiently established by evidence *aliunde* the confession.

In addition to the evidence specifically directed to the transaction to which the charge in the indictment relates, there was, apart from the confession, evidence of a general shortage (as to which a point is sought to be made and to which we shall later refer), which, assuming it to have been properly admitted, tends to prove the commission of the crime charged, or at least is corroborative of the immediate circumstances pointing to the commission of the crime of which the accused was convicted. And, the jury having passed upon all the facts, it is too late to now say or to claim that the failure of the defendant to prepare a tag from which the exact nature of the transaction could have been ascertained by the bookkeeper might have been a mistake or an oversight, for the proposition now under consideration stands sustained by these salient and uncontradicted facts: That on the seventh day of May, 1908, the firm of Cook & Passalacqua was indebted to the bank in the sum of $1,000 and accrued interest; that the bank held the firm's note for that sum; that Cook & Passalacqua had sufficient funds on deposit in the bank with which to pay the note and interest, and that said firm did in fact pay said note on that day in the form of a check drawn on said bank; that there was cash in the vaults of the bank on said day approximating in amount the sum of $20,000; that the defendant personally conducted the transaction, receiving the check and filing it in the customary place and manner and surrendering the note to Cook and entering the interest paid thereon in the interest account; that, although he was himself the immediate custodian or keeper of the loan register, in which the record of all loans paid and of credits on loans was kept, he failed to make an entry in said register of the payment of said note, thus allowing it to remain on the books as an apparent asset of the bank.

It is very true, as counsel for the appellant suggests, that none of the officers and clerks of the bank called as witnesses for the state testified directly that there was any money of the bank misappropriated or converted to a wrongful use by the defendant or any other person on the seventh day of May, 1908. Under the system by which the defendant conducted his dishonest operations it was manifestly impossible to disclose, except through evidence of circumstances, a specific

defalcation and, therefore, it is not to be wondered that no witness could be produced who could give *direct* testimony of the fact at issue here. The further claim of counsel for the appellant that there is no testimony showing that the defendant omitted to make a tag indicating the payment of the note of Cook & Passalacqua is not sustained by the record. As seen, there is evidence showing that the system by which the inside business of the bank was conducted called for a tag, placed on a particular file, revealing the exact nature of every daily transaction, and from which tag the bookkeeper made the proper entry in the proper book. There is no evidence that a tag disclosing the fact of the payment of the Cook & Passalacqua note was made by the defendant and placed on the customary file, while, on the other hand, there was introduced in evidence the book containing the loan account of the bank in which a record was kept of all loans paid and in which, from and including the seventh day of May, 1908, to and including the day the bank was closed by the bank commissioner—December 3, 1908—there was no record of the payment of said note. Thus it must readily be observed that the circumstances disclosed by the evidence very strongly tend to show that the defendant made no tag of the transaction and that the money represented by the check delivered to him in payment of the note was diverted from subserving its legitimate purpose by him and thus misappropriated.

Unavailing is the argument that, if this particular money was embezzled at all by the defendant, it might have been thus taken at a time prior to and remote from the seventh day of May, 1908, for the important and the undisputed fact, obviously inconsistent with that view, is that there was in the bank on that day sufficient money with which to meet the demands of the check of the firm of Cook & Passalacqua, and that the final act in the consummation of the misappropriation of that particular money occurred on that day. We know from common knowledge that the moneys ordinarily paid into a bank are not kept separate and apart in distinct packages as such moneys are paid in, but are intermingled together with all the other moneys of the bank, and thus go into the common mass of the money kept for all the purposes of the business. Therefore, the check of Cook & Passalacqua on the bank, in which they had on deposit sufficient funds to satisfy said check, and in which there was on hand a large

amount of ready cash, available for all the purposes of the bank, was, in our opinion, no different from cash itself, and payment of the note in that form under the circumstances indicated constituted in reality a cash transaction. And it is manifestly immaterial what might have been the specific purpose of the defendant in misappropriating the money thus received from Cook & Passalacqua—whether it was to use that particular money on that very day to further some individual scheme or transaction or to use it in covering up or partially concealing evidence of prior defalcations, in the hope of postponing discovery of the general deficiency in his cash accounts. By this we mean to be understood as saying that even if he actually took no money from the bank on the day of the Cook transaction, but merely used it to juggle the books as to some other account in order to make it balance or appear straight, he nevertheless thereby misappropriated that particular money and in substantial effect wrongfully converted it to his own use, the fraud of the transaction being indubitably shown, as we have seen, by the fact that he allowed the canceled note of Cook & Passalacqua to remain as though a living asset of the bank. If this is not embezzlement within the meaning of the law (Pen. Code, sec. 504), then we confess that we are at a loss to know what acts will constitute that offense.

Section 504 of the Penal Code provides, among other things: ". . . Every officer, director, trustee, clerk, servant or agent of any association, society or corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or *secretes it* with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement." The indictment charges, among other things, that the defendant "did willfully, unlawfully, fraudulently and feloniously *secrete,* with a fraudulent intent to appropriate to his own use and to a use and purpose not in the due or lawful, or due and lawful, execution of his trust" the money referred to therein. Thus it will be observed that, under section 504 of the Penal Code and the allegations of the indictment, it is immaterial *when,* before the filing of the indictment, the money was actually used, except in so far as the matter of time might be affected by the statute of limitations, if it be proved that the defend-

ant *secreted* the money or property for the unlawful purpose. The statute seems to have been enacted with the object of meeting the exigencies of just such circumstances as appear in the case at bar. We do not suppose that the proposition will be challenged that, under the terms of the quoted section of the Penal Code, the act of secreting property of another by his agent, into whose hands such property has come for his employer, with the intent to convert it or to appropriate it to a use or purpose not within the scope of the objects of the fiduciary relation, amounts to a misappropriation of such property and therefore embezzlement. So, as stated, if, in the case here, the money was either *secreted* within the meaning of the statute, or used to cover up some other shortage or actually taken from the vaults of the bank and used in some transaction with which the bank had no connection, the crime is, in either event, proved. The elements which must be shown in order to establish the crime of embezzlement as alleged in the indictment here are these: 1. That defendant was an agent of the party from whom the money or property is alleged to have been embezzled at the time of such wrongful conversion; 2. That the property charged to have been embezzled must have come into the hands of the defendant as the property of his employer; 3. That defendant received it in the course of his employment; 4. That he appropriated such property to his own use with intent to steal it. (Pen. Code, secs. 504, 506, 509; *People* v. *Hemple,* 4 Cal. App. 125, [87 Pac. 227], and cases therein cited.)

The general rule is that the mere proof of defendant's connection with the crime is not sufficient to establish the *corpus delicti.* Nor is it necessary, in order to establish the essential elements of the crime, to prove the defendant's connection with it. The rule, however, does not go so far as to exclude, in showing the *corpus delicti,* proof of the defendant's connection with the crime, where the circumstances of the case are such that proof of the crime of necessity involves proof of defendant's guilt. In the case at bar, it is manifest that the evidence directed to the proof of the *corpus delicti* necessarily involved defendant's connection with the crime, for he is inseparably connected with every important circumstance introduced for the sole purpose of proving the *corpus delicti.* We have, therefore, necessarily considered, in connection with

12 Cal. App.—2

the question whether the elements of the crime charged have been well enough proved to open the way for the proof of the defendant's confession, the proposition whether, upon the whole record, the jury were justified in returning a verdict of guilty. Hence, we feel no hesitation in declaring that all the elements of the embezzlement charged in the indictment are brought home to the defendant by the proofs. That the accused was the agent of the bank on the seventh day of May, 1908, and that the money alleged to have been embezzled by him came into his hands as such agent as the property of and for his employer, are uncontroverted and incontrovertible propositions in this case. That, on the seventh day of May, 1908, he either secreted the money mentioned in the indictment with the fraudulent intent to convert it to his own use, or did actually use it with the fraudulent intent to appropriate it to his own use, or to a "use and purpose not in the due and lawful execution of his trust," we think, as before suggested, the circumstances thus far considered clearly *tend* to show, and that his guilt was sufficiently established to justify the verdict by those circumstances and other evidence, to which we shall later refer, we do not entertain the slightest doubt.

2. It is urged that the court seriously erred, to the detriment of the defendant, in its rulings admitting certain evidence. It is first claimed that evidence of a general shortage was not admissible for the purpose of proving the specific crime of which the defendant was accused and convicted. The theory of the argument upon this point is that such evidence comes within the rule excluding proof of another and distinct crime from the one charged. But we fail to perceive any merit in the contention. There can be assigned no sound reason on principle why evidence of a general shortage, brought about through the criminal act of a party, is not competent proof tending to support a specific charge of embezzlement where, as here, the particular transaction on which the charge is based is included in or a part of such general shortage. Such testimony is not, of course, conclusive of the truth of the charge, but furnishes only an important circumstance tending to prove it. It is admissible for the purpose of negativing the idea that the particular transaction giving birth to the specific charge was due to a mistake and to show guilty knowledge or the fraudulent intent.

Counsel for appellant refers to the case of the *People* v. *Walker,* 142 Cal. 94, where it is held by a divided court that evidence of a general indebtedness is not admissible as proof of the specific crime of embezzlement charged in the information. But that case does not sustain the position of counsel here for the reason that the facts there are decidedly different from those here. The court says: "In the case at bar the said testimony objected to was not of any other embezzlement; it was simply of a *general indebtedness,* and it appears affirmatively that the $80.35 charged to have been embezzled *was not included in the general balance which the books showed.*"

As already observed, the charge in the case here grows out of one of a number of fraudulent transactions culminating in the general shortage of over $100,000, and, as is said by Henshaw, J., in *People* v. *Sanders,* 114 Cal. 216, [46 Pac. 153] : "If the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence, simply because it involves the commission of another crime"; citing *People* v. *Tucker,* 104 Cal. 440, [38 Pac. 195]. (See, also, *People* v. *Ebanks,* 117 Cal. 663, [49 Pac. 1049], and *People* v. *Walters,* 98 Cal. 138, [32 Pac. 864].) The distinction between the Walker case, *supra,* and this case, so far as is concerned the point under present discussion, may thus be stated: In the former there was apparently no relation between the specific crime charged and the general shortage or "general indebtedness," as the court declares the general deficiency in that case to have been. Here there is a direct relation existing between the crime charged and the general shortage, because the former is shown to be one of the several transactions from which the general shortage arose, and the latter has, therefore, a tendency to establish the offense charged. In *People* v. *Walters,* 98 Cal. 138, [32 Pac. 864], Chief Justice Beatty states the rule allowing in exceptional cases proof of another offense than the one charged in clear and concise language.

Nor did the court err in admitting in evidence certain entries in the books of the bank and certain tags made, not by the defendant personally, but by subordinate officers of the bank. The rule is that evidence of entries in books made by persons other than the defendant himself is inadmissible against the accused unless there is proof connecting the defendant in some way with the making or knowledge of such

entries. The theory upon which the court allowed the proof of the tags and entries in the several books of the bank in the case at bar was that said tags and entries where not made by the defendant himself, were made by his clerks under his direction. The entries and the tags were offered and received in connection with the testimony of the bookkeeper himself, and herein lies the distinction between this case and that of the *People* v. *Blackman,* 127 Cal. 248, [59 Pac. 573], so confidently relied on by appellant, where the supreme court held that evidence of entries in the books of the corporation of which the defendant was secretary was, under the circumstances of that case, inadmissible to prove the charge of embezzling the funds of said corporation. There, at the time of the trial, the bookkeeper, who made the entries, was dead, and the books or their contents were allowed to go into the record as evidence of the defendant's guilt without proof having been made that he ever examined the books or that he knew anything of their contents. The court said: "If there was evidence that the entries were made by the defendant or under his direction, or with his knowledge, they would most undoubtedly be competent and important evidence against him." Nor is either the case of the *People* v. *Whalen,* 154 Cal. 472, [98 Pac. 194], or the case of *San Francisco Teaming Co.* v. *Gray,* 11 Cal. App. 314, [104 Pac. 999], cited by appellant, in point here. In the first-mentioned case it was held that the mere written copy of the report of an assayer showing the value of certain gold ore was not admissible as evidence where the assayer was not produced as a witness, nor where the assay was made in the office of the assayer who was a witness but who did not himself personally make or supervise the assay. In the latter case it was held that "where, in an action to recover a balance due for the use of teams and teamsters, the only testimony to support the introduction in evidence of a work-book, showing the account against the defendants, is that of the bookkeeper of the plaintiff, who merely made the entries from a memorandum paper made by him from the *oral statements of the various teamsters, and who had no personal knowledge of the work,* such book is inadmissible." In both cases, it is plainly to be seen, the evidence offered was secondary or hearsay, pure and simple.

The evidence here indisputably shows, as we have before stated, that the full management and domination of the inside business operations of the bank were vested in and exercised at all times by the defendant. He alone directed and supervised the details of the administration of the affairs of the institution. He, as a rule, counted the cash on hand at the close of each day's business, and often examined the books, as it was his duty to do. The clerks and bookkeepers discharged their respective duties in obedience to the requirements of the system in vogue in the bank for many years, if not always from its organization, and all this under the immediate direction and control of the defendant. One of the books—the loan register and *the* important book in this case—was kept by the defendant himself. The witness Cox, who was the bookkeeper in the bank for some seventeen months prior to the discovery of the shortage, testified that the defendant looked over the tags of each day on every following morning. He further stated that the accused "would always check over the adding machine slip to see that each debit and credit was listed by the machine"; and that it was the defendant's custom to check each tag with the list preparatory to having it entered in the books. Furthermore, the defendant, a couple of months prior to the transaction on which the indictment is founded, and in the month of July, 1908, which, as is apparent, was subsequent to said transaction, delivered to and filed with the bank commissioner reports verified by him, setting forth facts which were thus represented to be sustained by the balance sheet, the authority for which were the books of the bank. Moreover, when, on the fourth day of December, 1908, in response to a previous demand by the bank commissioner, the defendant delivered to that official a copy of what purported to be the balance sheet of the day before, he, after being plied with some questions concerning the affairs of the bank, admitted that the statement of the loans was incorrect and admitted that he was responsible for the condition of the loans and made a full and practically an accurate explanation of the deficiency and the cause thereof. It may be added that it was at this time that he confessed having wrongfully used and misappropriated over $100,000 of the bank's funds.

We have gone over the testimony sufficiently to show that the defendant possessed full knowledge of the contents of all

the books and their condition and of the tags narrating each day's transaction and the general condition of the affairs of the bank. Under these circumstances, it cannot for a moment be doubted that the books and tags were admissible for the purpose of disclosing a general shortage and thus a circumstance tending to establish the truth of the · specific crime charged in the indictment.

What we have said with respect to the admissibility of evidence of the tags and the entries in the books applies with equal force to objections to evidence bearing upon certain other features of the case. But it is particularly urged that testimony showing that the defendant during the period within which occurred the transactions leading to the general shortage engaged in stock gambling on a very extensive scale, and that the books of the county assessor for said period disclosed comparatively little property to be assessed in his name, was erroneous and prejudicial. This evidence was clearly competent as involving circumstances tending to show that the defendant used the bank's money for private speculation and thus caused the enormous deficiency in the cash accounts of the institution.

Other specific objections to the court's rulings are pointed out, but this opinion has now been extended to too great a length to give them particular notice. It is enough to say that we have taken the pains to carefully examine all these assignments and have found nothing in them detrimental to the substantial rights of the accused.

3. The court did not err by refusing to give to the jury instructions 4, 7 and 8, requested by the defendant. These instructions would have told the jury, in effect, that the defendant was authorized or had the right to borrow money from the bank whose funds he is charged with having misappropriated, and that if they (the jury) believed from the evidence, or entertained a reasonable doubt upon the proposition, that the defendant borrowed the money involved in the specific charge and in the general deficiency, it would be their duty to acquit. There was no evidence offered to show that the defendant borrowed the money. But undoubtedly the rejected instructions were requested upon the theory that they were pertinent because, as expressed by counsel in his brief, ''it is in evidence that the right of the defendant to borrow from the bank was not questioned by anyone con-

nected with the bank,'' and further, that, after the disclosure of his shortage, he paid the bank in full on account of the shortage. In the absence of any evidence whatsoever supporting the only theory of which the refused instructions could be predicated—that he did borrow the money—and in view of the confession of the defendant by which he not only admitted his responsibility for the losses to the bank, but that such losses were due to his own unauthorized and wrongful acts, the instructions were entirely out of place in the record. But appellant contends that the fact, admitted in evidence, that he returned the money to the bank amounts to proof that the other officers of the bank treated the transactions resulting in the shortage as involving loans. This position is drawn from the evidence of the written acknowledgment by the board of directors of the bank of the receipt of money from the defendant sufficient to cover the general shortage; but, apart from the mere written receipt itself, there is no evidence explaining that transaction, except in so far as it is explained by the general evidence showing the shortage and the defendant's wrongful responsibility therefor, and, of course, this does not sustain but negatives the theory that defendant borrowed the money.

Appellant insists that the court erred in its rejection of certain other instructions requested by him. These instructions are numbered 12, 13, 18, 24 and 76. The court's charge was exhaustive and, in our opinion, fully and clearly covered every principle pertinent to the issue and the facts. Instructions 12 and 76 were, in a little different language, given in those instructions in which the jury were in substance and in very plain terms told that, notwithstanding the evidence of the entries in the books tending to show a general shortage, the defendant was entitled to an acquittal unless his guilt of the specific crime charged was proved beyond a reasonable doubt. We think the court made it appear very clearly to the jury that the defendant could not be legally convicted on the proof alone of false entries or omissions to make proper entries not directly involving the charge laid in the indictment.

As to the other rejected instructions it may be said generally that those principles therein declared which were applicable to the case and therefore proper to be read to the jury were sufficiently covered by the general charge of the

court, and manifestly no harm could follow the refusal to repeat them in the language of appellant.

Instructions Nos. 42, 48, 49, 56, 57 and 61, given to the jury on the motion of the people, are denounced by appellant as prejudicially erroneous. We find absolutely no merit in any of the criticisms directed against these instructions. We shall not examine all these in detail. The criticism of instruction No. 42, as to which it is declared that the court thereby instructed the jury that proof of criminal negligence on the part of the defendant would · establish the offense, involves, in our opinion, a palpably erroneous construction of its purpose and effect. The first part of the instruction is based on and is in the language of sections 20 and 21 of the Penal Code, and is in abstract form. The part of the instruction animadverted upon reads: ''The court instructs you that in every crime or public offense there must exist a union or joint operation of act and intent, or criminal negligence.'' The court, as is obvious, thus referred to crimes generally and not to the particular one then before the court, and the statement is not only correct as an abstract proposition of law, but is given in nearly every criminal case that is tried, whether the elements of the offense involved call for proof of a specific intent or for proof only of such criminal negligence as is sufficient in certain cases to establish a crime. There may and no doubt do arise cases in which an instruction involving an abstract statement of a proposition of law would be and is harmful to the accused. But this is not one of them. The instruction merely explains or states, as the law provides, that there are crimes. to consummate which the proof of criminal negligence is sufficient, but nowhere does the court expressly say that criminal negligence is all that is required to be shown in the crime with which the defendant is charged. To the contrary, as we have shown, the court, in other portions of its charge, declared in pointed language and concrete form the necessity of proof of a fraudulent and felonious intent with respect to the specific act imputed to the defendant and described and charged in the indictment before his conviction could legally follow.

We have given this record extended as well as careful consideration and have been unable to discover any error in the trial of the cause which would justify the reversal of the judgment and the order. The record is a large one and the

briefs of counsel on both sides voluminous in size and exhaustive in argument, but we have, nevertheless, endeavored to give to all the important points presented the consideration which we thought they deserved. The trial appears to us to have been fair in all respects and we doubt not for a moment that the result is justified by the proofs. We may further add, in conclusion, that if the facts of the Cook & Passalacqua transaction, as they are disclosed by the record here, do not sufficiently establish that the specific crime charged in the indictment was committed on the day named in said indictment, and that those facts with other evidence properly received do not show that the defendant committed it, then it is difficult to conceive of a case where a bank cashier, engaged for a series of years in a systematic wrongful use of the funds of the bank, and possessing the ability and cleverness to so manipulate the books of the institution as to keep in obscurity for all those years the fact of his dishonesty and the methods by which he has prosecuted his faithlessness to his trust could ever be made to answer for his crime. Stockholders and depositors could thus be robbed with licensed impunity and their despoiler go unwhipt of justice. Where, as here, for illustration, the total defalcation involves innumerable distinct transactions and its prosecution has covered a period of four or five years, there must always be great difficulty experienced by public officers charged with the execution of the criminal laws to specifically prove any particular one of the many transactions from which the general shortage has arisen, and if the courts, though properly requiring at all times that no substantial right of an accused citizen shall be taken from him in the trial of the charge against him, are to heed and adopt the hair-splitting yet disingenuous refinements often characterizing the arguments of learned and ingenious lawyers in their interpretation and application of rules of evidence, particularly when their clients are beset by desperate circumstances, there would then, indeed, invariably appear insuperable obstacles to the true course of justice in such cases.

For the reasons herein given, the judgment and order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.