[Crim. No. 870.   Third Appellate District.—March 10, 1926.]

THE PEOPLE, Respondent, v. G. E. WARDWELL,
Appellant.

[1] Criminal Law—Embezzlement—Falsification of Bank Records
—Evidence—Verdict.—In this prosecution for embezzlement of
bank moneys and falsification of bank records, the evidence was
sufficient to show, without any reasonable doubt, that the de-
fendant embezzled the amounts and at about the times charged
and there is no rational basis upon which the jury could have
returned a verdict of not guilty.

[2] Id. — General Shortage of Bank Assets — Evidence. — In such
prosecution, the contention that evidence of a general shortage of
bank assets was not admissible to prove the embezzlements charged
in the information cannot be sustained.

[3] Id.—Information—Pleading—Evidence.—In such prosecution, the
claim of defendant that certain counts of the information do not
state facts sufficient to constitute public offenses because it is
not alleged that omissions from, and a false entry in, the bank

---

1.   See 10 **Cal. Jur.** 270.

records pertained to the "business or affairs of the bank," cannot be upheld; and the failure to allege that such omissions and false entry did pertain to the business and affairs of the bank could not by any possibility have prejudiced the substantial rights of the defendant.

[4] Id.—Use of Bank Money — Embezzlement — Instruction — Evidence.—In such prosecution, it was proper to instruct the jury that if the defendant used the money of the bank "to cover up some other shortage in the assets of said bank, or if it was actually taken from the possession of said bank by the defendant and used in some transaction with which the bank had no connection, the crime with which he is charged is, in either event, proved"; but even if it be conceded that the instruction should not have been given, the evidence of defendant's guilt is so overwhelming that it cannot be said that the giving of the instruction has resulted in a miscarriage of justice.

[5] Id.—Argument—Misconduct.—In such prosecution, the district attorney was not guilty of prejudicial misconduct in his argument to the jury.

[6] Id.—Misconduct — Assignment — Admonitory Instruction—Appeal.—An assignment of a statement made by the district attorney as misconduct and a request to admonish the jury to disregard the statement are necessary as a foundation for a complaint to the appellate court of misconduct.

(1) 7 C. J., p. 578, n. 6.   (2) 7 C. J., p. 578, n. 6; 20 C. J., p. 482, n. 39.   (3) 7 C. J., p. 577, n. 88.   (4) 17 C. J., p. 368, n. 5; 20 C. J., p. 490, n. 90.   (5) 16 C. J., p. 896, n. 85.   (6) 16 C. J., p. 896, n. 85; 17 C. J., p. 180, n. 18; 20 C. J., p. 487, n. 62, 63.

APPEAL from a judgment of the Superior Court of Lassen County and from an order denying a new trial. H. D. Burroughs, Judge. Affirmed.

The facts are stated in the opinion of the court.

A. K. Wylie, N. J. Barry and Hardin Barry for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The information herein contains eighteen counts. The first fourteen counts charge embezzlements of

6. See 8 Cal. Jur. 508; 2 R. C. L. 438.

money and the remaining counts charge falsifications of bank records. Counts 1 and 10 were dismissed and the defendant was convicted of the crimes charged in the others. This appeal is from the judgment and the order denying a new trial.

The Lassen Industrial Bank is located at Susanville. It maintains a branch bank at Bieber, which will be referred to as the Bieber Bank. During the times herein mentioned the Bieber Bank had funds on deposit in The Anglo & London Paris National Bank of San Francisco. The latter bank will be referred to as the Anglo Bank. The defendant entered the employ of the Bieber Bank as a clerk December 3, 1916. In the early part of 1922 he became assistant manager and about May 10, 1923, he was promoted to the position of manager and thereafter served in that capacity until May 10, 1924. During the first years of his employment he "made the remittances, sorted checks, kept the individual ledger." He kept all the records for two or three years before he became manager and made the daily reports to the Lassen Bank. During the time he was manager he was alone in the bank, except that he had a boy to assist him for about two months and another boy for two or three months. Immediately prior to the time he became manager he was engaged "in the garage business . . . a little over a year or a year and a half." He was agent for and sold "some" automobiles, sold automobile accessories, and carried on a general garage business. He also "had a sporting goods store and selling guns and taxidermy work." In June, 1923, he sold his store and his garage business.

The second count charges the embezzlement of $5,400 on or about July 20, 1923. The evidence shows that on July 11, 1923, John Pallido presented his personal check, drawn on the Alturas Branch Bank of Fort Bidwell and payable to the Bieber Bank, for the sum of $5,400 and that a time certificate of deposit was thereupon issued to him by defendant for the amount of the check. The certificate was left with defendant, but was not paid until after he left the bank. The defendant properly entered the certificate in the time certificate register. In the "date paid" column he wrote in red ink "6/24/23." He entered the $5,400 as a credit in the time certificate of deposit account in the general ledger on the twelfth day of July,

1923, and the same sum on the debit side four days later. He then made out and kept a deposit slip showing a credit to Pallido's checking account in the sum of $5,400 and entered the same on the cash sheet, but not in the general ledger. Neither did he credit Pallido's check account in the ledger with any sum. The defendant testified: "Pallido come into the bank with a check for fifty-four hundred dollars and put it on time certificate. I sent the fifty-four hundred dollars into the Anglo in the regular way and issued him time certificate and he gave the check (certificate) to me and left it there in my charge and it was my impression he said he would leave it there and if he wanted any money to buy sheep all he would have to do was to notify us and we would transfer it to the checking account, and on the twentieth day of July I transferred it to his checking account, but didn't give him a ledger sheet for some cause or other." Pallido had not directed the transfer and he then had to his credit in his checking account about $1,800. The net result°of the defendant's acts was to reduce the bank's liabilities on the records in the sum of $5,400. The other charges of embezzlement all relate to amounts for which certificates of deposit were issued by defendant. In two instances he made no record whatever and in the others he entered them in the time certificate register and marked them paid without any payment having been made. The course pursued was not the same in every instance as that in connection with the Pallido certificate, but the effect was to so falsify the records as to show that all of such certificates had been paid and had ceased to be liabilities of the bank, when in fact they were all outstanding obligations. There is no contention to the contrary. It would serve no useful purpose, therefore, to lengthen this opinion by a detailed statement of the various false entries made by defendant in connection with the other certificates. The amounts charged by the other counts to have been embezzled are as follows: July 10, 1923, $1,000; December 2, 1923, $1,000; December 14, 1923, $560; December 8, 1923, $500; January 4, 1924, $550; February 15, 1924, $1,000; February 10, 1924, $500; February 13, 1924, $1,200; February 13, 1924, $3,800; April 28, 1924, $1,600; August 7, 1923, $6,073.35. The foregoing amounts and dates correspond with the amounts of the cer-

tificates and the false dates of payment thereof as entered by defendant in the register. By the fifteenth and sixteenth counts the defendant is charged with failure to make any record of the two certificates which he did not enter in the books of the bank. By the seventeenth and eighteenth counts he is charged with making false entries in the records of the bank.

After defendant had left the bank, and while its officers were endeavoring to disentangle its affairs, upon inquiries made by them, they were informed by defendant that he had removed some of the sheets from the ledger and placed them in a safe deposit box, of which he had the key. The defendant surrendered the key and 139 individual ledger sheets were found in the box, also some checks and deposit slips. These ledger sheets showed balances due depositors in the aggregate sum of $61,455.91. The outstanding certificates of deposit were over $30,000 more than the books showed. The sum of $6,000 more than the books showed was due depositors in the savings department. The savings account of one depositor had a balance of $4,270.83 on the 11th of February, 1924. The defendant transferred the whole thereof to the general commercial account of the bank, closed the savings account of the depositor, without giving him any credit in his checking account or otherwise, and drew a draft on the Anglo Bank for the exact amount of such savings account. The defendant testified that he did this because the Bieber Bank's commercial account with the Anglo Bank was running low. Numerous other manipulations of the books were shown which had the effect of lowering the record liabilities of the Bieber Bank, but it is deemed unnecessary to enumerate them all. The uncontradicted evidence shows that the assets of the bank had been depleted in the aggregate of more than $100,000.

The defendant, after he left the bank, with the approval of the board of directors, employed E. M. Wilson, a competent expert accountant, to audit its books and affairs. Wilson was given every opportunity to make a thorough investigation and the defendant was permitted to work with him. The bank later employed Wilson to make a further examination. He testified that there did not appear to have been any shortage on the 31st of August, 1920; that on August 31, 1921, there was a shortage of $13,609.05; on

May 14, 1923, $47,191.98 in the commercial accounts and $525 in the certificate of deposits account; and on May 22, 1924, $59,441.95 in the commercial accounts, $20,986.83 in recorded certificates of deposit, $13,215.84 in unregistered certificates, $4,000 in notes receivable, $6,063.27 in savings account, and $1,943.63 in the account with the Anglo Bank, making a total shortage at that time of $105,651.52.

The account-books of the bank are of the loose-leaf type, the sheets thereof being unnumbered and interchangeable. The defendant testified: ''There was a shortage when I took charge of the bank and I took those leaves out of the ledger and filed them away to get by the bank examiner and keep the bank on its feet until such time as I could find the errors and go and show what happened. . . . I thought I could show the bankers where it was and make a big name for myself and get some place.'' He further testified that he then thought the shortage was about $30,000; that he first discovered there was a shortage in August, 1921; that it was then about $28,000 and kept increasing; that ''the ledger was off balance that much''; that he never reported the shortage to any person; that he did nothing to cover it up and removed none of the ledger sheets until after he became manager; that he did not include the hidden accounts in his daily reports to the Lassen Bank because ''they wouldn't have balanced''; that he ''took out the accounts that wasn't apt to change''; ''I would take out a bunch and as the accounts would go down or get active I would move them back into the active ledger and take out some that wasn't so active. They were changing all the time.'' He did not explain the method by which he made the books balance prior to the time he became manager. One of the officers of the bank testified: ''I questioned him (defendant) as to how this shortage had grown and what was the cause of it. He indicated by statements to me that it was on account of allowing overdrafts. That he had allowed individuals and corporations to draw or that they had been allowed to draw against the accounts that didn't exist in fact, . . . indicating that had continued for a considerable time and the bulk of it occurred previous to the time he became manager of the bank. . . . He stated that was the cause of practically all the shortage. . . . He told me these checks that had been

drawn would be paid and without making any record of them whatever, they would be returned to the drawer, leaving no evidence in the bank who obtained the money. I said, 'You want me to understand you have been fool enough to let money go out that way without keeping a record of it,' and he said yes he had. . . . He referred to the account of the Juniper Mining Company. This had taken place during the management of Sanders (the man who preceded defendant as manager). . . . A check would come in when the mining company didn't have a balance to its credit. . . . Regardless of whether the Juniper people came in and actually put in the money for them, they were returned to the Juniper people and not kept as a record of the bank. . . . No record of them kept at the bank. . . . He said the shortage that existed was largely made up in that way. He didn't say it was all made up through the drawings of the Juniper Mining Company. The Juniper Mining Company was the only one he referred to. . . . As to the other overdrafts, there wasn't any fixing of time." The defendant testified that he once called Sanders' attention to the fact that the Juniper Mining Company had overdrawn its account by a check for $1,360 and "I passed him the check and that was the last I seen of it and I knew there was something wrong about it"; that the Juniper Mining Company's account was not charged with the $1,360 and that he did not know whether the check was paid by the bank or whether the company thereafter deposited sufficient money to cover the overdraft. He did not testify that the company had overdrawn its account at any other time. He did not deny the various false entries made by him or explain why he made them, except as herein stated. Other witnesses testified that the defendant stated that the ledger sheets "had been coming out.for a long time," a few at a time; that "he said he did all the manipulating and made most of the figures," that "he didn't receive any benefit from them (the certificates of deposit) himself whatever. It was used for other purposes but never told me what purposes, . . . straightening up other things that had been done creating shortages"; that "he said no one else was implicated with him."

Admitting that the books and records of the bank were improperly kept, appellant contends that the evidence does

not show any actual diminution of the assets of the bank, but merely a "book shortage." The uncontradicted testimony of several witnesses, however, shows that the assets of the bank had been depleted to the extent of more than $100,000. Mr. Wilson testified that the shortages of August 31, 1921, and May, 1923, were book shortages. The statement is obviously correct. He had no means in May, 1924, of ascertaining what the assets of the bank actually were in 1921 or 1923, but could only determine what the records of the bank disclosed in that regard. At the time of his audit he was able to count the cash then on hand, compute the amount of the notes, and determine the other assets actually in the possession of the bank. He testified: "You couldn't say absolutely it was a cash shortage. It is simply a deficiency of the resources over liabilities. . . . Your resources are deficient that much to balance your liabilities. . . . I wouldn't say absolutely it was a cash shortage in a way. I would say the resources are simply deficient." Other witnesses gave testimony to the same effect. There is also testimony to the effect that the assets were not depleted in any amount between the time that defendant left the bank and the time of the Wilson audit. It is clear that an actual shortage of assets, not a mere book shortage, was shown.

There is abundant additional evidence showing that the assets of the bank were depleted during the time the defendant was in full charge of its business. The Bieber Bank and the Lassen Bank transferred funds back and forth as necessity required. In case of a heavy reduction in the total amount of deposits in the Bieber Bank, without a corresponding reduction in the amount of bills receivable that bank was under the necessity of replenishing its funds by drawing on the Lassen Bank. No other reason appears for so drawing during the time defendant was manager. During that time the deposits in the Bieber Bank decreased in the total amount of $8,524.13 and the loans in the sum of $7,766. It thus appears that during the time the defendant was manager there was no necessity of drawing on the Lassen Bank for any large amount. During that period, however, as such manager, he drew on the Lassen Bank in the total amount of $81,500 and transferred to it $39,000, making a net transfer to the Bieber Bank of

$42,500. Practically all of this large sum is wholly un-accounted for. What defendant did with it must be left to inference from the other facts in evidence. Those facts point unerringly to defendant's guilt. Every time he failed to record a certificate of deposit or falsely entered a record of payment thereof, he created the opportunity to embezzle a corresponding amount of the bank's assets. Correspond-ing amounts of such assets must have been withdrawn, otherwise his daily statements of assets and liabilities would have been out of balance, and the evidence shows that they balanced, except for minor errors. Such statements, of course, did not include the liabilities shown by the hidden records, but the fact that such records were secreted merely tends to show that other and additional assets had been em-bezzled, either during the time of defendant's management or prior thereto. [1] The evidence, therefore, is sufficient to show, without any reasonable doubt, that the defendant embezzled the amounts charged and at about the times charged. There is no rational basis upon which the jury could have returned a verdict of not guilty.

[2] Appellant contends that evidence of a general short-age of assets was not admissible to prove the embezzlements charged in the information, citing *People* v. *Walker,* 142 Cal. 90, 93 [75 Pac. 658]. The facts of this case are unlike those of the Walker case and are similar to those involved in the case of *People* v. *Rowland,* 12 Cal. App. 6, 19 [106 Pac. 428, 433], where it is said: "Counsel for appellant refers to the case of *People* v. *Walker,* 142 Cal. 94 [75 Pac. 658], where it is held by a divided court that evidence of a general indebtedness is not admissible as proof of the specific crime of embezzlement charged in the information. But that case does not sustain the position of counsel here for the reason that the facts there are decidedly different from those here. The court says: 'In the case at bar the said testimony objected to was not of any other embezzle-ment; it was simply of a general indebtedness, and it ap-pears affirmatively that the $80.35 charged to have been embezzled was not included in the general balance which the books showed.' . . . Here there is a direct relation exist-ing between the crime charged and the general shortage, because the former is shown to be one of the several trans-

actions from which the general shortage arose, and the latter has, therefore, a tendency to establish the offense charged."

[3] It is contended that counts 15, 16, and 17 do not state facts sufficient to constitute public offenses. Count 15 charges that defendant "was manager and an officer and employee of the Bieber Branch of the Lassen Industrial Bank . . . and . . . as such manager . . . there came and was under his control and possession a certain record known as a 'Time Certificate Register,' which said record was then and there the property of and kept by said corporation and by said G. E. Wardwell as manager, officer and employee thereof, and said G. E. Wardwell, . . . the 7th day of August; with intent in him the said G. E. Wardwell, to deceive the officers and directors of said Lassen Industrial Bank, . . . did then and there wilfully, unlawfully and feloniously omit, at said time, or at all, to make any record of the issuance of a time certificate of deposit to Clara Bieber for the amount of six thousand and seventy-three and 35/100 dollars, though in truth and in fact a time certificate of deposit was actually issued by him on said date to Clara Bieber for said amount." The sixteenth count is in like form. In similar language, the seventeenth count alleges that the defendant made a false entry in the general ledger relative to a deposit of $5,400 made by John Pallido. The objection urged is that it is not alleged that such omissions and false entry pertained to the "business or affairs of the bank." It reasonably appears from the facts alleged that such omissions and false entry did pertain to the business and affairs of the bank. Besides, the failure to so allege could not by any possibility have prejudiced the substantial rights of the defendant.

It is urged that the court erred in refusing to give six instructions proposed by defendant. Appellant has failed to point out wherein the proposed instructions were material to the case. A careful examination of them shows that they contain no statement of law not fully covered by instructions which were given.

[4] The court instructed the jury to the effect that if the defendant used the money of the bank "to cover up some other shortage in the assets of said bank, or if it was actually taken from the possession of said bank by

the defendant and used in some transaction with which
the bank had no connection, the crime with which he is
charged is, in either event, proved.'' The instruction is in
accordance with the law as stated in *People* v. *Rowland,*
12 Cal. App. 6, 16 [106 Pac. 428]. Even if it be conceded
that the instruction should not have been given, the evidence
of defendant's guilt is so overwhelming that it cannot be
said that the giving of the instruction has resulted in a mis-
carriage of justice.

[5] Appellant strenuously contends that the district
attorney was guilty of prejudicial misconduct in his argu-
ment to the jury. The district attorney therein said:
''Ladies and gentlemen of the jury, we have seen how Mr.
Wardwell marked the certificates of deposit paid, reducing
the amount of the time certificates of deposit on the time
certificate register and in the general ledger, drawing on
the home office in Susanville for the amount of money,
which would increase the amount which the Bieber bank
owed the home office, transferring that money into Anglo
London and Paris National Bank of San Francisco and
diverting it out of there—that was one method. It was then
subject to his check and could be diverted by him.'' On.
objection by counsel for defendant to the effect that the
district attorney's statement was outside the evidence and
prejudicial error, the court said: ''I think counsel is merely
giving his deductions from the evidence that has been in-
troduced and I think he is entitled to give his deductions.
. . . The objection is overruled.'' The prosecution was
unable to prove, and was not required to prove, the par-
ticular method by which the embezzlements were effected.
Having proved that the assets of the bank entrusted to
defendant had disappeared and the manner in which the
business of the bank was conducted, including falsifications
of the records by defendant, the district attorney had the
right to draw any reasonable inferences therefrom as to
the means employed in appropriating such assets. Drafts
were admitted in evidence showing that defendant, as
manager, had drawn on the Lassen Bank, through the
Anglo Bank, about $80,000. The funds so transferred to
the Anglo Bank were subject to ''his check,'' as manager,
and ''could be diverted by him.'' Appellant argues that
there is no evidence that ''the defendant did or could have

drawn his personal check'' on the Anglo Bank ''for any
money whatever.'' But the district attorney did not so
state. At another point in his argument the district at-
torney said: ''That cash was taken right from the home
office here and Anglo—one hundred thousand dollars trans-
ferred into the Anglo Bank and checked out by Mr. Ward-
well. Now, that is the situation.'' Counsel for defendant
said: ''We object to the statement that any money was
checked out of the Anglo account. There is no such evi-
dence in the record. It would have been an impossibility
for Wardwell to have checked any money out of Anglo.
He had no checking account with Anglo. When he makes
that statement to the jury he is stating something that isn't
in the record and I ask the jury be instructed and admon-
ished to ignore any such statement.'' The court said to
the jury: ''The jury will understand that they are to be
governed only by the evidence introduced in the case
and if counsel don't get the statements of the evidence cor-
rect, if you desire to have the evidence read to you, we will
do so. He is merely drawing his conclusions from the evi-
dence and he is entitled to draw such conclusions as he
desires. Objection overruled.'' Counsel for defendant re-
quested the court to admonish the jury to disregard the
statements of the district attorney, but did not assign such
statements as misconduct. [6] ''Such assignments and
requests were necessary as a foundation for a complaint
to this court of misconduct.'' (*People* v. *Routh,* 182 Cal.
561, 567 [189 Pac. 436, 438].) Neither does it appear that
the district attorney transcended the bounds of legitimate
argument in drawing the conclusions stated by him. It
clearly appears that such statements were mere deductions,
and reasonable deductions, from the evidence. The as-
sistant cashier and auditor of the Anglo Bank testified that
the checks paid by that bank and charged to the Bieber
Bank were returned twice a month to the latter bank; that
in one instance the defendant ''drew a draft on the Susan-
ville bank for six thousand dollars and charged it to the
Anglo-London Paris National Bank's account on his books,
but it was never sent to San Francisco at all for credit,
nor had Susanville ever received that item.'' Under such
circumstances, the defendant had the opportunity to em-
bezzle the $6,000 without any shortage appearing in his

book accounts. Similar deductions may be made from his many other falsifications of the .bank's records. It was naturally beyond the power of the prosecution to show the particular method or means by which the defendant appropriated the funds of the bank. Whether he directly took the money, or paid checks which were fictitious or drawn by persons having no moneys on deposit and which were returned to such persons without any record being made thereof, as he said was done in cases of overdrafts, or whether some other method was pursued, does not appear. But it was not incumbent upon the prosecution to prove such particulars. That he fraudulently appropriated the assets of the bank, by some means, to some ''use or purpose not in the due and lawful execution of his trust'' (Pen. Code, sec. 504), appears with great clearness and certainty. Since crimes are not usually committed for the philanthropic purpose of benefiting others, it is a fair inference that the defendant appropriated such assets to his own use.

The other errors complained of are of slight importance and need not be specially considered. None of them could have affected the verdict.

The judgment and the order are affirmed.

Hart, J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 9, 1926, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 3, 1926.