The other questions under the indictment have been discussed
in the Ostrander case decided at this term.

The judgment of the oyer and terminer allowing the demurrer
should be reversed.

PUTNAM, J., concurs.

------

# Court of Appeals.

May 24, 1892.

## PEOPLE v. STEPHEN F. SHERMAN.

(45 St. Rep. 298; 133 N. Y. 349.)

1. Larceny—What constitutes.

> Where the manager of three grain elevator corporations, which
> form an association of which he was also manager, transferred
> grain from one elevator to another without the usual entry on the
> books of the one from which it was transferred, confusing and
> falsifying the accounts so as to conceal his act and assented to
> the false weighing of the remaining grain and sold that removed,
> it was held to be sufficient to sustain a conviction for grand larceny
> under the provisions of section 528 of the Penal Code.

2. Same—Defense.

> It is no defense that the proceeds of the sale went into his bank
> account as manager of the association and were applied upon its
> liabilities.

**3. Witness—Refreshing memory.**

Where a witness manifests a disposition to favor the defendant, the prosecution may call his attention to his testimony before the grand jury and ask him leading questions.

Appeal from judgment of the supreme court, general term, fifth department, affirming judgment of conviction of the crime of grand larceny in the first degree.

Louis Marshall, for appellant.

Geo. T. Quinby and Tracy C. Becker, for respondents.

FINCH, J.—The evidence given for the prosecution furnished an adequate foundation for the conclusion of fact involved in the verdict of the jury. The business combination of the numerous elevators, the consequent complication of their dealings with their customers and with each other, and the peculiar system of accounts which become necessary, rendered it extremely difficult to follow and trace any particular and identical ownership of grain from its original receipt to its final disposition; and yet a prolonged study of the proofs has left upon our minds the conviction that the defendant did convert to his own use and misappropriate the grain referred to in the indictment. That he caused it to be transferred from one elevator to another without the usual and competent order and authority; that he confused and falsified the accounts so as to cover and conceal his action; that the "shortage" resulting from the removal was concealed by a false and fraudulent weighing of the remaining grain, occasioned by his indirect suggestion, to which he assented and of which he availed himself; and that he sold the grain which it was his duty to keep and for the delivery of which to the true owner the elevators were bound, the facts more or less clearly proved, and supported by sufficient evidence to put them beyond our review.

Nor is it an adequate answer to say that the proceeds of the sales made by Sherman went into his bank account as manager of the Associated Elevators, and were applied by him upon its liabilities. The elevators were bailees. Their contract and their duty was to keep and not sell the grain, to deliver it in specie and not in its value in money, and the sale and conversion

by Sherman was not condoned or relieved of its character as a crime by transferring the proceeds to those who had no right to receive them. But the evidence does not at all exclude an inference of the jury that the proceeds went to Sherman's benefit. In his bank account were involved all of his private and personal transactions as well as those of the elevators and possible to trace only by the stubs of his checks. Against that account he drew at his pleasure for all purposes, and that the loss of this grain, however pushed along or disguised by substitution, landed as a loss upon the elevators is quite certain from the evidence.

It is claimed, however, that the defendant could not properly be convicted of the form of larceny which the indictment charges. The offense is described as within the second subdivision of section 528 of the Penal Code, and the claim now made is that the grain was in the custody and control of the elevator corporations and not in that of the defendant. The section itself obviates the difficulty. It assumes that beneath the technical legal control of the corporation as such lies an actual and effective custody and control of corporate officers and servants. They are specifically described, and the fact is this corresponds with the description. The corporation as such, the technical legal entity, cannot suffer imprisonment for a crime, but those who represent it and act for it as its officers and agents can. The defendant, as general manager, had the custody and control of the grain in the elevators. It was by means and by force of that very custody and control that he was enabled to shift the grain, to sell and convert it and confuse and falsify the accounts. It is of little utility to carry our inquiry back to the terms of the Penal Code when the offense charged and proved is clearly within it.

Error is further alleged to exist in the admission of the evidence showing the false weighing of the grain, and in the suggested inference therefrom contained in the charge of the trial judge. That proof was competent to show the actual fact of the alleged "shortage," notwithstanding the apparent and reported result of the weighing, and as a foundation for the further fact, very strongly proved, that the defendant assented to and availed himself of the fraud with full knowledge of its existence. Be-

yond that, the circumstantial evidence tends forcibly to the in-
ference that the deception practiced had its origin in the pur-
pose and necessities of the defendant.   He knew the fact of the
"shortage," for it originated in his own act.   His superintendent
Klieves also knew it.     There were frequent conversations
about it.   Sherman said he didn't want to be known; Klieves
had a conversation with the men before the weighing with refer-
ence to such weighing; without telling them what to do it was
easy to indicate the disastrous consequences certain to follow
if the elevator failed to hold out; the men averted those conse-
quences by making it nearly hold out; when it was done Klieves
said, "I didn't tell the men to do it," and Sherman added, "I
didn't tell you to tell the men to do it," and yet conceals the
fraud from his principals, stands upon and defends himself
with it and so makes it his own.   The men who accomplished
it had no conceivable motive of their own; quite surely the
deception did not originate with them; and it takes very little
reflection to become confident of its source.   The evidence was
admissible and was properly submitted to the jury.

I do not think that the court transcended its just discretion in
the examination Klieves.   Called by the prosecution, he mani-
fested a disposition to favor the defendant and keep back or
soften injurious facts.   Necessarily some degree of latitude in
his examination was allowable.   I do not think that any effort
was made on behalf of the People to impeach him.   On the con-
trary, the effort was to make him tell all that he knew.   For
that purpose it was proper to refresh his recollection or remove
his hesitation by recalling to his mind what he had already
once testified to before the grand jury.   The right to ask the wit-
ness leading questions was asserted by the prosecution, ad-
mitted by the defense to be within the discretion of the court,
and that mode of examination permitted.   The court made no
ruling which allowed an impeachment of the witness, explicitly
declaring that no such question had yet arisen.   We think no
erro was committed.

The remaining questions raised do not seem to us to require
discussion.

The judgment should be affirmed.

All concur.