## PEOPLE v. LEIPSIC.

### Cr. No. 656; September 17, 1900.

#### 62 Pac. 311.

**Embezzlement as Bailee—Insufficiency of Evidence.**—A defendant cannot be convicted of the embezzlement of money as bailee under Penal Code, section 507, upon evidence which shows without contradiction that he received the money from the complaining witness to be invested for her in stocks, and that he so invested it, and that if he was guilty of any offense it was the conversion of the stocks, the relation between the parties as to the money being one of agency, and not of bailment.[1]

APPEAL from Superior Court, City and County of San Francisco; William P. Lawlor, Judge.

Prosecution of Benjamin Leipsic for embezzlement. From a judgment of conviction defendant appeals. Reversed.

J. N. E. Wilson and Raymond Barry for appellant; Attorney General Ford for the people.

CHIPMAN, C.—Defendant was convicted of the crime of embezzlement, and was sentenced to five years' imprisonment at San Quentin. He appeals from the judgment and from the order denying his motion for a new trial. There is no brief on file for the people. The prosecuting witness and the defendant were the only witnesses sworn at the trial. Defendant insists that the evidence wholly fails to sustain the verdict of guilty of the offense charged in the information, and our conclusion is that he is right in this contention. The

---

[1] Cited and followed in State v. Mispagel, 207 Mo. 573, 106 S. W. 517, where it was held that a charge of embezzlement or larceny of money is not sustained by proof of the embezzlement or larceny of a draft or check.

crime charged was that on July 24, 1896, at San Francisco, defendant "was then and there the bailee of Mary Feeney, and as such bailee was then and there intrusted by said Mary Feeney with the following property and money of her, the said Mary Feeney, to wit, one hundred and ninety dollars, lawful money of the United States"; and that he received said property as bailee, and while so intrusted did on said day willfully, etc., "embezzle, convert, and appropriate the same to his own use," etc.

The court correctly instructed the jury that if they found from the evidence that the defendant received this money from Mary Feeney for the purpose of investing it for her in mining stocks, and that he did invest said money for her or for her benefit in mining stocks, and thereafter he fraudulently converted said mining stocks to his own use, then he cannot be convicted of this charge. In the instruction marked "7" the court in effect, and correctly, charged the jury that, before they could convict the defendant, they must be satisfied beyond a reasonable doubt (1) that during the period covered by the transaction in question the defendant was the bailee of the complaining witness, Feeney; (2) that she was the bailor of defendant; (3) that defendant as such bailee, and in the course of his relations with the complaining witness as bailee, received the $190 in money from her as bailor, and feloniously converted the said money to his own use, with intent to steal it, without her knowledge or consent; and (4) that prior to lodging the complaint in this case against defendant she, as bailor, demanded from him the return of the money, which he feloniously and fraudulently failed to do.

Defendant was engaged in selling milk, and Mrs. Feeney was one of his customers. She had known him for ten years, and he had previously to the present transaction attended to business for her. He bought some real estate for her. She had other stock transactions, and one with defendant, before this one. She was familiar with the stock board transactions, and understood buying stock on margin and how assessments are kept up. As to the transaction in question, she testified that defendant in July, 1896, told her he had a point on a stock called "Challenge," and would double her money inside of thirty days. She had no money, but had some collaterals, on the security of which she borrowed $190, and gave the money to him. "He said he would buy this stock that he got

a point on. . . . . He sold that stock out at another time, and bought another stock. I saw him about a week afterward, and he told me he had bought the stock. He said he held the stock. I never saw the stock. . . . . I demanded the stock or some money about a year after the first transaction. This stock went up to the figure that he bought it at, and I told him to sell the stock then that he said he bought. He told me that he could not sell it at that time, because it had been garnished. I asked him how could my stock be garnished for his debt, and he told me that the stock was at the broker's in his name. I trusted him up to that. . . . . That was the first time he informed me that the stock had never been in my own name. I demanded of him to sell the stock and give me the money—whatever money that was coming to me out of it. . . . . I think this was about 1897. It must be 1898 at that time. I cannot remember when, about in 1897, that I had any talk with him about the stock. Every once in a while I would talk to him about the stock.'' On cross-examination she testified that she knew he had the stock on margin, and that she paid him money ''to keep up the margin.'' On redirect examination, she testified that she put up money five or six times for margins or assessments, during which time he told her he had this stock. ''I asked him to sell the stock. I was tired of paying assessments on it. Q. What did he say then? A. He said he would keep it until it went up to what he paid for it. Q. Did it go up? A. Yes; and then I sent him word to sell it.'' On recross-examination she testified that she had only defendant's word that he had bought the stock. ''Q. That is the way these transactions were done with you right along? A. Yes; he told me. I took his word. Q. You say upon these other transactions there was nothing occurred to attract your suspicions? A. I was too honest myself to suspect that he was dishonest. Q. What put it in your head about a year ago to arrest this man? A. I commenced to think that he was not treating me right when the stock went to $2.50. Then I commenced to think myself that he was not dealing with me right. Q. It was purely a matter of suspicion? A. Yes.''

The defendant testified in his own behalf that they were both dealing in stocks. He received the money from her, and invested it in five hundred shares of Challenge. They both had the same broker—one Coleman. She had several times sent

him with an order to Coleman for her, and sometimes went herself to him in person. She told Coleman that he should act on any order witness gave for her. They finally quit dealing through Coleman. She turned over her account to witness, and said he could act for her. Witness closed up the margins, and changed his account to Broker Gosliner, to whom he gave the order for five hundred shares of Challenge Consolidated, at fifty eight. "The $190 was the margin. The stock came close on to $300." He then describes with some particularity the ups and downs of the stock, and his frequent reports to Mrs. Feeney; that he also bought for her some California Consolidated at $1.85, and that there was an assessment on it while she had it. He testified: "I told her that the margin I had would hold it as it was. It did go to $2.50, so I came to her house. I said, 'Mary, the stock to-day is selling for $2.50.' She says, 'Shall I sell it?' I said, 'If you heard the stock was going to $5, I would advise you to hold it.' So she says, 'I will leave it to you'; and the stock went down." He then describes the fluctuations in this stock; that assessments were levied, part of which and a part of the margin that had to be kept good she paid; that it finally went down to $1.10; more assessments came and more margins were demanded; and the result was that the stock was sold out. Defendant tells a straightforward story, entering into particulars as to the entire transactions from 1896 to the early part of 1898, showing that as late as December, 1897, Mrs. Feeney paid money through defendant to preserve her holdings, and this was a year and a half after the transaction in question. Mrs. Feeney was called in rebuttal, and was asked but one question, which was if she had ever authorized or given a written order to Coleman to have her account transferred. Her answer was not responsive to the question, but she answered that defendant told her Coleman was not an honest man, and advised her to transfer the account to him, which, in effect, was an admission that she had given the order. She made no denials whatever of any fact to which defendant had testified. She did not call Coleman as a witness, nor give any explanation for not doing so. Defendant testified that Gosliner had gone to the Klondyke, and that he had inquired at the Pacific Stock Exchange, where Gosliner was a broker, for his books, and could learn nothing about them.

I have given the evidence with greater particularity than is usual, for the reason that in no other way could the nature of the transaction be correctly interpreted. Defendant is charged as bailee, under section 507 of the Penal Code, and not as a clerk, agent or servant, under section 500. It seems to me that the testimony fails entirely to establish the guilt of defendant as charged in the information. The evidence shows the relation of agency (Civ. Code, sec. 2295), and not that of bailee (Civ. Code, sec. 1813 et seq.). It also shows that the money received by defendant was invested in stocks for the benefit of Mrs. Feeney, and that, if defendant converted any of her property, it was the stocks, and not the money. The verdict was against both of the instructions above noted, and the conviction is not sustained by the evidence. The judgment and order should be reversed.

We concur: Haynes, C.; Gray, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order are reversed.