## STATE v. CLAYTON et al.

No. 5183.   Decided November 16, 1932.   (15 P. [2d] 1057.)

*Christenson & Straw*, of Provo, for appellant.

*Geo. P. Parker*, Attorney General, and *L. A. Miner*, Deputy Attorney General, for the State.

STRAUP, J.

The defendants, Heal and Clayton, in the Fourth judicial district, by information, were jointly charged with the crime of embezzlement. They were tried separately; each defendant being represented by different counsel. Both were convicted, and both appeal. Each filed and presented to this court a separate and complete record of the cause. There is no substantial difference in the records. Separate briefs were filed in each case. The Clayton Case was filed first in this court. The two cases, however, were argued and submitted together at the same time and at the same term.

Both defendants complain of the sufficiency of the information, the sufficiency of the evidence to support the information and the verdict, portions of the charge to the jury, and of the court's refusal to charge as requested by

the defendants. As the Clayton Case was filed first, we shall first consider that case. What is said concerning it equally applies to the Heal Case.

The substance of the information is that Heal was president of the Provo Consolidated Real Estate Company, a domestic corporation doing business at Provo, Utah; that Clayton was the secretary of the company, and that both were its managing officers; that on May 7, 1928, John Bestelmeyer at Provo executed and delivered to the real estate company his check drawn on the Knight Trust & Savings Bank of Provo in the sum of $1,208.67, payable to the order of the real estate company, which "check was delivered as aforesaid for the use and benefit of Janie Smith, and that Heal and Clayton, as officers of the Provo Consolidated Real Estate Company, by and through the Provo Commercial & Savings Bank (at Provo), did on the 9th day of May, 1928, present said check to the said Knight Trust & Savings Bank for payment and received the sum of $1,-208.67," lawful money of the United States; that Heal and Clayton as officers of the real estate company being "intrusted with said check and said money, the proceeds of said check, as bailee of Janie Smith, and the said check and the said money, the proceeds thereof, together with other money paid to the Provo Consolidated Real Estate Company, a corporation, prior thereto, was intrusted to and received by" Heal and Clayton as officers of the real estate corporation to be delivered by them to the I. O. O. F. Home Board of Utah, a corporation, "for the purpose of paying a certain note secured by a real estate mortgage on property owned by Janie Smith, said note and mortgage being made and executed by said Janie Smith to Harvey Cluff and by said Harvey Cluff assigned to the said I. O. O. F. Home Board of Utah, a corporation, and being then and there owned and held by the said I. O. O. F. Home Board of Utah, a corporation, in the sum of $2,500.00," and that Heal as president of the real estate company and Clayton as secretary thereof "being so intrusted as bailee of said check and the said

money, proceeds of said check, to the amount and value of $1,208.67, the property of Janie Smith," as officers of the real estate company, failed and neglected to deliver the moneys of the said check to the I. O. O. F. Home Board of Utah to pay the note and mortgage "in accordance with the terms of said bailment," and that on the 9th day of May, 1928, Heal and Clayton, as officers of the real estate company, "wilfully, unlawfully, fraudulently and feloniously converted the check and proceeds thereof to their own use."

A general and a special demurrer were interposed to the information, both of which were overruled. A plea of not guilty was thereupon entered. The substance of the evidence adduced by the state is that the Provo Consolidated Real Estate Company was a corporation organized under the laws of Utah in 1917 to do a general real estate busi- ness at Provo; to buy and sell real estate and negotiate and effect sales of lands; to act as agent for owners in the collection of debts and rentals; to do a general brokerage business in notes, mortgages, stocks, etc., and in buying and selling them; to borrow money for the benefit of the corporation; to negotiate, place, and collect loans of money for a commission; and to do all things necessary and relevant to a general insurance, loan, and real estate business. The company was capitalized for 5,000 shares of the par value of $1 each, of which Heal, as an incorporator, held one share, and was elected secretary and a director of the company. The remaining shares were subscribed for and held by others.

Clayton was not an incorporator, nor then an officer of the company. In 1921 Heal was elected president and a director of the company and Clayton a director, secretary, and assistant treasurer. Heal then held 1,000 shares. Just what Clayton then held is not made to apepar, but in May and October, 1924, Heal held 2,830 shares and Clayton 1,419 shares. The evidence shows that from thence on Heal and Clayton constituted the managing officers of the company.

From 1923 to June 30, 1929, Janie Smith did business with the company. The state put in evidence an itemized account of her transaction with the company between such dates. An account, which was a final account, was furnished her by the company June 30, 1929. The correctness of it in no particular was questioned or challenged. The more important business transactions had by her with the company began in January, 1924. At that time she, through the company, obtained a loan of $2,500 from one H. Cluff. She gave her promissory note therefor, the payment of which was secured by a mortgage on real estate owned by her. The principal of the note was "payable three years after date (January 15, 1924) with privilege of paying off at any interest paying period after one year." The interest at the rate of 8 per cent per annum was payable "quarter yearly." The moneys obtained by the loan were with the consent of Mrs. Smith paid to the real estate company and credited to her account. Some of the moneys, as directed by her, were paid and applied by the company to obligations owed by her. Part thereof was paid to her. The interest as it matured on the note was paid to Cluff by the real estate company out of moneys held by it to the credit of Janie Smith. Cluff on December 22, 1924, assigned the note and mortgage to the Home Board of the I. O. O. F. of Utah to secure the payment of a note given by him to the Home Board for money borrowed by him from it. The Cluff note was paid, and on February 19, 1929, the Home Board, at the request of Cluff, assigned the Smith note and mortgage to Freda Cluff, the former wife of Cluff. Not anything is made to appear that the real estate company or Heal or Clayton had any notice or knowledge of such assignments. At the time of the trial, the interest but no part of the principal of the Smith note had been paid.

On April 30, 1926, Janie Smith by written contract sold the real estate, upon which she had given the mortgage, to Margaret Bestelmeyer for $8,000, $1,000 of which was paid in cash, $1,000 to be paid August 30, 1926, and $500 on

April 30 of each year thereafter until the sum of $8,000 was fully paid, together with interest at 8 per cent per annum on all deferred payments; the interest payments being payable semi-annually. The contract provided all payments, both principal and interest, were to be made to the Provo Consolidated Real Estate Company. It further provided that the seller, Janie Smith, had the right to execute and maintain a loan secured by mortgage on the property not to exceed $2,500. The sale of the real estate was negotiated by an agent of the real estate company other than Heal or Clayton, for which negotiation the agent was allowed a commission of $400 which was charged against the account of Janie Smith. At that time the account between her and the real estate company showed a credit in her favor of $4,643 and a debit of $3,381, or a credit balance over the debit account of $1,262. The $1,000 paid in cash in the real estate transaction was paid by check of J. M. Bestelmeyer, the husband of Margaret Bestelmeyer, payable to the order of and was paid to the real estate company and credited to the account of Janie Smith. On Septerber 8, 1926, Bestelmeyer paid an additional $1,000 on the purchase of the real estate; on July 16, $38; on December 16, $278; on February 25, 1927, $500; and on May 7, 1928, $1,208.67—all of which payments were made to the real estate company and were credited to Janie Smith.

Thereafter five additional interest payments were made to the real estate company by Bestelmeyer, a payment of $200 on the principal March 28, 1929, and on June 8 a further payment on the principal of $700, all of which were also credited to the account of Janie Smith. The last interest payment made was June 30, 1929. After May 8, 1928, when the payment of $1,208.67 was made, the real estate company by about twenty different payments up to June 28, 1929, paid interest on the Cluff mortgage and cash to Janie Smith amounting to over $500 and charged such payments against her account. On June 30, 1929, there was a balance remaining unpaid on the Bestelmeyer contract of about $4,428 and

some unpaid interest. On December 20, 1929, the amount remaining unpaid, including interest, amounted to $4,616.31, which by April 30, 1930, was reduced to $4,546.40. On June 30, 1929, when the final account was rendered, Janie Smith had a credit of $5,698.13 and was charged with a debit of $2,192.13, showing that her credit account exceeded the debit account by $3,500. The real estate company then agreed to pay the Cluff mortgage of $2,500, which, by the account rendered, was charged against Janie Smith, leaving a balance credit in her favor of $1,000, for which the real estate company gave her its promissory note, which was accepted by her, and in that manner the credit and debit accounts were balanced. It further was shown without dispute that the real estate company gave Mrs. Smith credit for interest at the rate of 8 per cent per annum on all moneys to her credit over and above her debit account, some of which was paid to her.

The account so rendered shows numerous transactions had between Mrs. Smith and the real estate company, the principal items of which consisted of the loan of $2,500 obtained for her and the sale of the real estate negotiated for her, by the real estate company, the negotiations of which were had and conducted by its agents other than Heal or Clayton. Clayton, by his testimony, explained each item of the account in detail showing a running account between Mrs. Smith and the real estate company from 1923 to June 30, 1929. He testified, and it is not denied by her, that she frequently came to the office and checked over her account, especially in May and in June, 1929, and on divers times prior thereto. He testified that in June, 1929, when her account was checked up and when it was shown she had a credit balance of $3,500 over and above the debit account, she stated there then was enough credit to pay off the Cluff mortgage, and asked that $2,500 be paid for such purpose; that, upon being asked what she desired done with the balance of $1,000, she stated she did not need the money right then, and arranged to leave such balance with the company;

that he told her the company did not then have sufficient funds to pay the Cluff mortgage, but as soon as it was in funds the mortgage would be paid. Such testimony is not denied by Mrs. Smith, except by her testimony that in March, 1930, when she called at the office of the real estate company and at other times thereafter she demanded of Heal and Clayton her deed and mortgage and other papers and that they promised to get them for her but failed to do so.

Just when the real estate company ceased to do business is not shown. Counsel have not advised us as to that. All we have observed in such respect is the testimony of one of the witnesses who testified that he was the assignee of the real estate company appointed by the court for the benefit of creditors. When that was done is not shown.

The embezzlement charged and relied on by the state relates to the $1,208.67 payment made by Bestelmeyer May 7, 1928, on the purchase of the real estate. In such particular it is charged that such moneys were received by Heal and Clayton for the use and benefit of Mrs. Smith, that such moneys were intrusted to them as officers and agents of the real estate company to be by them paid on the Cluff mortgage, but that they, in breach of such trust, unlawfully, etc., converted such moneys to their own use. She testified that when the real estate was sold she had a conversation with Heal and Clayton wherein she told them that, as the principal was paid, she wanted it applied on the Cluff mortgage until it was paid. The interest paid on the real estate transaction was to be paid either to her or credited to her. She testified the next transaction had with Clayton was along the first months of 1929. At that time she testified Clayton gave her a receipt which was dated back to May 8, 1928, and which recited, "Received from Janie Smith $2,500 payment from J. M. Bestelmeyer for contract, paying mortgage to Harvey Cluff in full," which was signed, "Provo Consolidated Real Estate Company, By J. P. Clayton." The state also put in evidence a receipt dated May 7, 1928, which recited, "Received of J. M. Bestelmeyer $1,208.67 payment on

contract with Janie Smith," which also was signed, "Provo Consolidated Real Estate Company, By J. P. Clayton," She testified she had no further conversation with Heal or Clayton until March 15, 1930, when she and her two sons went to the office of the real estate company and there had a conversation with Heal, either in the presence or in the hearing of Clayton, in which conversation she asked Heal for "my deeds and the mortgage on the place," and that Heal said, "We have taken your money and spent it and your mortgage is not paid; what are you going to do about it; there isn't enough money paid in at one time to pay on the mortgage." She disputed that, and claimed that as low as $50 could have been paid on the mortgage, which Heal disputed; that he told her times had been hard; that they went behind, and offered to give her second mortgages to secure her, but she declined to accept them; that she then told Heal that she had a "receipt paid in full to Harvey Cluff for $2,500.00"; and that thereupon Heal turned to Clayton and asked him if he had given her such a receipt and Clayton replied he had. As to that conversation Mrs. Smith was corroborated by her two sons. The defendants denied any such conversation, and also denied that Mrs. Smith had asked them to apply the moneys received from Bestelmeyer on the Cluff mortgage as the principal on the sale of the land was paid.

As has been seen, the Bestelmeyer check, the moneys which it is charged were embezzled by and converted to the use of Heal and Clayton, was payable to the order of the real estate company. The check was handed to Clayton. He put it in the cash drawer of the company. The next day an employee of the company other than Heal or Clayton, together with a number of other checks all aggregating $1,816.56 in the regular course of business, deposited them with the Provo Commercial & Savings Bank, the bank with which the real estate company did business, and the real estate company and not Heal or Clayton was given credit therefor. And in the regular course of business, the check, by the Provo Com-

mercial & Savings Bank, was presented to the Knight Trust & Savings Bank and was paid by it. The amount so deposited, including the $1,208.67 check, was by the Provo Commercial & Savings Bank applied to an overdraft of the real estate company of $811.37, and the company given credit for the balance; but on May 11, 1928, two or three days thereafter, the real estate company had a credit balance at the bank of $3,681.15 and on June 23, 1928, a credit balance of $3,982.84. How the account thereafter stood at the bank is not shown. No part of the moneys of the $1,208.67 check was received by either Heal or Clayton, nor was any part thereof applied to the use or benefit of either. By the terms of the contract of the sale of the real estate, the payments, both principal and interest, were required to be and were paid to the real estate company, not to Heal or Clayton. All of the payments were so paid, and all of them credited to the account of Mrs. Smith. The $1,208.67 check was handled in the same way as all other checks paid in by the Bestelmeyers were handled.

The argument is that, as testified to by Mrs. Smith, Heal and Clayton at her request agreed to apply on the Cluff mortgage the principal of the sale of the real estate sold to the Bestelmeyers, and, since Heal and Clayton, as managing officers of the real estate company, could so have applied such moneys but failed and neglected to do so, such failure rendered them guilty of embezzlement; and, too, guilty of the charged embezzlement, of converting such proceeds, not to the use or benefit of the corporation, but to their own use and benefit. In support thereof, the state refers to Comp. Laws Utah 1917, § 8307, and to the cases of *People* v. *Floyd,* 78 Cal. App. 11, 247 P. 917; *People* v. *Wardwell,* 77 Cal. App. 44, 246 P. 97; *Hinds* v. *Territory,* 8 Ariz. 372, 76 P. 469; *People* v. *Cobler,* 108 Cal. 538, 41 P. 401; *People* v. *Roberts,* 85 Cal. App. 697, 259 P. 1009; *People* v. *Whalen,* 154 Cal. 472, 98 P. 194. The section referred to provides:

"Every officer, director, trustee, clerk, servant, or agent of any association, society, or corporation, public or private, who fraudulently

appropriates, to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or secretes the same, with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."

As is seen, the statute applies to persons who are officers or agents of and occupying a fiduciary relation with an association, society, or corporation, public or private, and to whom property of the association or corporation, etc., has been instrusted, and who fraudulently appropriate it to a use or purpose not in the due and lawful execution of the trust. In other words, it applies to an agent or officer characterized by the statute who fraudulently appropriates property of the association or corporation, private or public. And to that effect are the cited cases, cases where the agent or officer of a city, county, bank, or other corporation, appropriated moneys or property of the city, county, bank, or other corporation. But that is not this case. It is not charged, nor does the evidence show, that Heal or Clayton appropriated any moneys or property of the real estate company of which they were agents and officers. What in such respect is charged by the information is that they appropriated and converted moneys, the property of Janie Smith, to their own use and benefit; but the evidence does not show they did that. It does not show that they appropriated or converted anything to their own use or benefit. True, the evidence shows that the agreement, as testified to by Mrs. Smith, that moneys paid on the principal of the real estate sold to the Bestelmeyers was to be applied to the Cluff mortgage, was not carried out. But the agreement was not the individual personal agreement or promise of Heal or Clayton. It was the agreement of the corporation, the real estate company. Of course, the agreement, as testified to by Mrs. Smith, was made with Heal and Clayton, not in their individual capacity, but as agents and officers of and for and on behalf of the real estate company to whom the moneys were to be paid and with whom Mrs. Smith had all her dealings

and who by agents other than Heal or Clayton obtained the loan and sold the real estate for her. There was no fiduciary relation shown between her and Heal or Clayton. Whatever fiduciary relation there was, if any, was between her and the real estate company. Because she directed the officers or agents of the corporation how moneys paid in, not to them but to the corporation, for her use and benefit, were to be applied, does not create any fiduciary relation between her and the officers and agents of the company. Whatever civil liability, if any (14a C. J. 177) of Heal or Clayton there may be, because they are managing officers of the real estate company, did not see that the moneys paid in to the corporation by Bestelmeyer were applied on the Cluff mortgage, or failed to apply or cause them to be so applied, is one thing; but to hold them criminally liable for such failure is quite another and a different thing. We think the case of *Weber* v. *State*, 190 Wis. 257, 208 N. W. 923, 45 A. L. R. 928, is good authority that they, under the undisputed evidence in the case, may not so be held. The facts with respect to the particular point in hand in that case are similar to the facts in this. It is not necessary to review them here. They may there be read.

We are not unmindful of the claim made that Heal and Clayton held and controlled most of the outstanding capital stock of the real estate company and that thus what was paid to it and deposited in its name was in effect paid to Heal and Clayton and inured to their use and benefit. The information does not proceed on any such theory. It is not charged that Heal or Clayton wrongfully or unlawfully converted the check or the proceeds thereof to the use or benefit of the real estate company or that they by so doing derived any benefit therefrom. Indisputably the dealings had by Mrs. Smith were with and in the name of the company and not with its agents or officers personally or as individuals. As individuals neither Heal nor Clayton had assumed or undertaken to do anything. It is not claimed by Mrs. Smith that they did. Let it be assumed that directors

and officers of a corporation may be held liable to persons who are injured by torts, fraudulent acts and misrepresentations of such officers, etc., but it does not follow in all such cases of civil liability, or for all breaches of corporate duty or obligations neglected to be performed or carried out by officers or agents of the corporation resulting in a loss or injury to a creditor, that such officers or agents may also be held criminally liable. While embezzlement is a criminal breach of trust, still every breach of trust is not nor is every fraudulent breach of trust embezzlement. 20 C. J. 423.

Now as to the information: While in general language, some of which in form of conclusions, it is averred that the *$1,208.67 check*, the property of Janie Smith, was intrusted to Heal and Clayton as officers of the real estate company and *as bailees of Janie Smith to be by them delivered to the I. O. O. F. Home Board* in payment of a mortgage assigned to it, that they failed to do so and converted the proceeds to their own use, yet it further is alleged that the check was made, executed, and delivered by Bestelmeyer to the real estate company, and that the proceeds thereof, as well as other moneys, were paid to it. To charge that the check was "intrusted" to Heal and Clayton "as bailees" of Janie Smith, without sufficient allegations of fact showing such a relation, is of little moment, and is inconsistent with the further allegations that the check was made, executed, and delivered to the real estate company and the moneys paid to it. If the information is not vulnerable as against the general demurrer, it is as against the special demurrer also lodged against the information on the ground of uncertainty, ambiguity, and failure to charge an intended offense in clear and concise language.

However, regarding the information on the theory contended for by the state, we think the evidence is insufficient to sustain it or to justify the verdict. That is especially true as to the allegations whether regarded as averments or fact or conclusions that the $1,208.67 check or the proceeds thereof were "intrusted" to Heal or Clayton "as bailees" or that

they or either of them converted the check or proceeds to their own use. That also is true as to the allegation that the check or proceeds thereof were delivered to Heal or Clayton to be by them delivered to the I. O. O. F. Board. The evidence fails to show that the check was delivered either to Heal or Clayton or to the real estate company to be delivered, as alleged, to the board. On the contrary, the evidence, without dispute, shows that the check was issued and delivered by Bestelmeyer to the company for and in part payment of the contract of sale of the real estate and the proceeds thereof to be applied thereon. And so did the contract, by the terms of which the moneys were to be paid, provide. In accordance therewith the check was paid to the real estate company by Bestelmeyer, and was received by it, not in any character of trust or confidence, but as part payment of the contract as by its terms provided, and as such was credited to Mrs. Smith's account, as were all other moneys received for and on her behalf; and as shown by the account rendered her, the items of which are not questioned, and, by the evidence, the dealings had by Mrs. Smith with the real estate company created but the relation of debtor and creditor and not one of trust in the sense required to constitute an embezzlement or a breach thereof. And, since the moneys held by the real estate company were not acquired or held in virtue of such a trust relation, no offense of embezzlement was committed by a failure or neglect to pay the moneys over. 9 R. C. L. 1274. Something more than mere access to and custody of property is required to constitute embezzlement. There must be a relation of trust and confidence imposed in the recipient of the thing appropriated and it must be by virtue of such relation of trust and confidence that the accused had access to or possessed or had control of the property. *State* v. *Ugland,* 48 N. D. 841, 187 N. W. 237; 20 C. J. 420.

Giving full credence to the testimony of Mrs. Smith, the effect thereof is that out of moneys received by the real estate company from the sale of the real estate to the Bestel-

meyers sufficient of the principal thereof was, as directed by her to be applied in payment of the Cluff mortgage, which, as testified to by her, the company through Heal and Clayton agreed to do. But the obligation to do so was an obligation of the real estate company with whom and in whose name she transacted all the business for a period of four or five years on an open or running account. She knew that all the moneys paid on the sale of the real estate were to be paid and were paid to the company and she given credit therefor; that the $1,000 paid to the company when the contract was executed, the $1,000 paid thereafter in September, 1926, the $278 in December of the same year, and the $500 in February, 1927, were all credited to her account in the same manner that the check of $1,208.67, which it is claimed was embezzled, was also credited to her account, and that thereafter two other payments on principal, one of $200 and one of $700, also were received by the company and credited to her account. Just as well did she understand that what of such moneys were to be paid or applied on the mortgage were to be paid by the company as a company's obligation. She was not misled or deceived as to that. Because the company failed to do so or because Heal or Clayton, as officers of the company, failed or neglected to cause such payments to be made, though such failure according to Mrs. Smith's testimony constituted a breach of promise or of an agreement, yet may not be characterized as embezzlement. *Fitzgerald* v. *State*, 50 N. J. Law 475, 14 A. 746; *State* v. *Butler*, 21 S. C. 353; *People* v. *Leipsic*, 6 Cal. Unrep. 536, 62 P. 311; *People* v. *Hurst*, 62 Mich. 276, 28 N. W. 838, and *People* v. *Bauman*, 105 Mich. 543, 63 N. W. 516.

Had the company not ceased to do business and had it been solvent, but failed to apply the check or the proceeds thereof when received by it on the mortgage as directed by Mrs. Smith, and, as here, presented the check in the ordinary course of business to the bank for payment and the proceeds thereof credited to its account and used the moneys in its business, and credited the amount thereof to the ac-

count of Mrs. Smith in the same manner as all other moneys received by the company for and on her behalf were credited, we apprehend no one would feel justified in charging the company or its officers with embezzlement, though the company be liable in a civil action for whatever loss Mrs. Smith might have sustained by reason of such failure. So far as concerns the offense of embezzlement or other crime, the situation is no different because the company thereafter failed in business and was unable to meet its obligations.

Lastly, the theory must not be overlooked on which the charge as urged by the state was laid in the information and the case submitted to the jury, which is, that the Bestelmeyer check and the proceeds thereof were delivered to the defendants as officers of the company to be by them delivered to the I. O. O. F. Board, that they failed to do so and converted the check and the proceeds thereof to "their own use," not to the use of the real estate company, and the court expressly charged that, unless the jury found that the defendant had "converted the moneys to his own use," they must acquit him. In that connection the court further charged:

"You are instructed that if you find from the evidence that by the agreement of Janie Smith with Margaret Bestelmeyer as shown by plaintiff's exhibit 7 the payments to be made by said Bestelmeyer under said contract were to be paid to the Provo Consolidated Real Estate Company or their order, and that there was no other agreement with respect thereto with the said Provo Consolidated Real Estate Company; and that thereafter, on or about the 7th day of May, 1928, payment of a check for the sum of $1,208.67 was delivered to the defendant, J. P. Clayton, for the Provo Consolidated Real Estate Company, and that said check was delivered to the possession of the said Provo Consolidated Real Estate Company, then you are instructed that such facts fail to show that there was any trust relationship between the defendant, J. P. Clayton and the said Janie Smith, and under such facts, if you so find, it is your duty to find the defendant not guilty."

The facts assumed or the hypotheses therein stated are established by the evidence without substantial conflict.

All the payments made by the Bestelmeyers were to be paid and in fact were paid to the real estate company. There was no agreement that any of such payments were to be made otherwise. That the $1,208.67 check was delivered to Clayton for the real estate company, that the check was delivered to the possession of the company and was deposited by it in the bank to its credit, also is undisputed. Right or wrong, the jury were required to obey the charge. The verdict as rendered was in disobedience thereto, and thus against law as stated and directed by the court.

The same observations may be made of the following charge also given by the court:

"You are instructed that if you believe from the evidence that Janie Smith consented to the use of her moneys paid in by Bestelmeyer on the contract in evidence, plaintiff's exhibit 7, and that the said company paid interest to the said Janie Smith on her balances as shown in her account with the said corporation or credited such interest with her knowledge and she accepted the same, then you are instructed that the relationship of debtor and creditor between said company and Janie Smith existed, and you are instructed that such facts will not support the charge of embezzlement as alleged in the information, and it is your duty to find the defendant, not guilty."

As is seen, about all of the essentials embraced in such charge are established without any substantial conflict in the evidence. That Mrs. Smith did consent to the use of the moneys by the real estate company received by it and paid in by Bestelmeyer on the contract and that the company with the knowledge of Mrs. Smith credited all of such payments to her account and paid or credited her with interest on "her balances as shown in her account" with the company, are indisputably shown by statements of her account rendered her by the company, and especially by the last or final account rendered her June 30, 1929, and which was accepted by and testified to by her as correct and was put in evidence by the state as showing the transactions between her and the company covering a period of about six years. In such particular the $1,208.67 check was handled and

credited in the same manner as were two prior checks of Bestelmeyer of $1,000 each, one of $278, and one of $500, and one subsequent thereto of $200, and one of $700 paid June 8, 1929, and all so exhibited in the account rendered her. That, the court charged the jury, constituted a relation of debtor and creditor and upon which a charge of embezzlement could not be predicated. Obedience to such charge required a verdict of not guilty. And further the propositions stated and considered in the instructions required the giving of the defendant's request for a directed verdict of not guilty which was refused and of which ruling complaint also is made.

We thus are of the opinion that sufficient facts, outside the stated conclusions, are not alleged in the information to show a bailment or that the defendants were bailees, or that the check or its proceeds were intrusted to them in a fiduciary relation, and that the court erred in overruling the demurrers, that the evidence is insufficient to support the verdict, and that the verdict is in disobedience to and against the charge of the court, and that the court erred in refusing to direct a verdict as requested by the defendant.

The judgment is therefore reversed and vacated, and the case remanded for a new trial.

EPHRAIM HANSON, J., concurs.

EIAS HANSEN, J. (concurring).

I concur in the order reversing the judgment and remanding this case for a new trial. I do so because, in my opinion, the evidence fails to show that the crime of embezzlement was committed by either of the defendants in the transaction relied upon by the state. The information proceeds upon the theory that the $1,208.67 paid by Mrs. Bestelmeyer on the contract was received by the defendants pursuant to a contract of bailment entered into between Mrs. Smith and defendants on or about April 30, 1926. Mrs. Smith testified that at about the time (April 30, 1926) that

she entered into the contract for the sale of the farm she told Mr. Heal and Mr. Clayton that, as the principal was paid on the contract, she "wanted it paid on the mortgage that was on the place, the $2,500 mortgage, until it was paid up and they said they would do that for me." The evidence shows without conflict that during the period of slightly more than two years which intervened between the date of that agreement and the date of the alleged offense Mrs. Smith had a running account with the real estate company. From time to time money was paid on the contract and credited to her account. Upon various occasions the real estate company paid Mrs. Smith money and charged it to her account. The real estate company paid the interest on the Cluff mortgage. The interest so paid was in part paid from interest received on Mrs. Smith's account with the real estate company and in part with money advanced by Mrs. Smith. The real estate company paid her interest at the rate of 8 per cent per annum upon all money standing to her credit upon its books. Mrs. Smith in effect testified that she was entitled to receive and did receive such interest. The following is quoted from her testimony on cross-examination:

"Q. Now you drew interest, didn't you, Mrs. Smith, from the Provo Consolidated Real Estate Company on the balance which you had there? A. I never drew a dollar interest out of the Consolidated Real Estate Company except after I sold my farm.

"Q. But after that you did? A. I drew interest on my money.

"Q. And they were supposed to pay you interest weren't they? A. Yes, sir, the interest was supposed to come to me.

"Q. But they were paying you interest after that transaction? A. They were paying me interest after.

"Q. After the Bestelmeyer sale? A. Yes, sir, I drawed interest along—some.

"Q. Now, can you answer the question whether it (the interest on the Cluff mortgage) was paid by the Provo Consolidated Real Estate Company and charged to your account? A. They was supposed to pay it to Mr. Cluff. * * *

"Q. You continued to receive interest or credits of interest in your account for money which the Provo Consolidated Real Estate Company held of yours after the Bestelmeyer sale was made, did you

not? A. I was supposed to receive the interest and the principal was supposed to be turned to them.

Q. I will ask you whether or not you did not testify in the city court of Provo City, at the preliminary hearing of J. P. Clayton, as follows, that is whether the following questions were not asked and the answers given: 'Provo Consolidated Real Estate Company were paying you interest on that, weren't they? A. On the money that Mr. Bestelmeyer paid in.

"Q. Yes? A. They were—I was supposed to get the interest then.'

"Q. And you so testified in the city court? A. I suppose so."

In the cross-examination of Mrs. Smith with respect to her account with the Provo Consolidated Real Estate Company, which account was placed in evidence by the state, the following question was asked and she gave the following answer: "Q. So far as you know, this statement of account is correct with respect to your financial transactions with the Provo Consolidated Real Estate Company? A. Well, as far as I know, I guess it is."

There are more than one hundred items of debits and credits in the account. The first entry shows a debit by check of $75 on December 22, 1923. The last entry is a credit of $64.71 April 30, 1930, interest to date.

The defendant testified on his own behalf. He stated that the interest was paid by the real estate company on the Cluff mortgage in this manner; that interest was computed at the rate of 8 per cent per annum on the money standing to the credit of Mrs. Smith on the books of the real estate company and the interest so ascertained was paid on the interest on the Cluff mortgage. If such interest so computed from Mrs. Smith's account was not sufficient to pay the interest due on the Cluff mortgage, the remainder was either paid in cash by Mrs. Smith or charged to her account. The testimony of Mr. Clayton in such respect is not controverted. It would seem clear that the interest which the real estate company paid on the money owing to Mrs. Smith on her account with the company was so paid for the use of the money standing to her credit. It is difficult to conceive of the real estate company agreeing to pay and paying interest on the money owing to Mrs. Smith unless it was entitled to use the money upon which interest

was being paid. Having received and accepted interest on the money which was paid on the contract by Mrs. Bestelmeyer to the real estate company, Mrs. Smith may not now be heard to say that the real estate company was a mere bailee of the money so paid and as such not entitled to use the same. Mrs. Smith must have known that the real estate company was not paying interest at the rate of 8 per cent per annum on money that it was not permitted to use. No claim is made, and under the evidence there is no foundation for the claim, that Mrs. Smith or any one else gave any instructions to the defendants, or either of them, or to the Provo Consolidated Real Estate Company that the check for $1,208.67, or the proceeds thereof, should be handled differently from the manner in which the other payments on the contract were handled. The check for $1,208.67, the proceeds of which it is alleged the defendants embezzled, was handled in exactly the same manner as were the other payments which were made on the contract. In each instance Mrs. Smith was given credit on the books of the real estate company for the amount paid. The evidence does show that, after the payment of $1,208.67 in question was credited to the account of Mrs. Smith, there was sufficient money standing to her credit to pay off the Cluff mortgage. There is, however, no evidence in this record which shows that Mrs. Smith, or any one else for her, directed the defendants to cease using the money paid on the contract when such payment added to the amount standing to her credit on the books of the real estate company should equal or exceed the amount owing upon the Cluff mortgage. In the absence of some such instruction, the defendants were justified in assuming that they were entitled to treat the proceeds of the check in question in the same manner as they treated the other payments made on the contract. If the defendants were entitled to apply, or honestly believed they were entitled to apply, the money in question to the use of the real estate company at the time it was so applied, it cannot be said they were guilty of embezzlement in so

applying it. It may be that, standing alone, the instructions which Mrs. Smith claims she gave to the defendants in April, 1926, precluded them from using the money here involved. But the evidence touching the course of dealing had between Mrs. Smith and the real estate company for more than two years immediately preceding the date of the alleged offense indisputably shows that Mrs. Smith and the defendants understood that the real estate company was entitled to use, for its own purposes until otherwise directed, the money paid upon the contract. Under such circumstances, it cannot be said that defendants were guilty of embezzlement in applying the proceeds of the check in question to the use of the real estate company.

The trial court was in error in refusing to instruct the jury to find the defendant not guilty. I also concur in the views expressed in the prevailing opinion that the verdict of guilty finds no support in the evidence when viewed in the light of the law announced by the court in its instructions to the jury. I think the demurrers (both general and special) to the information were properly overruled.

FOLLAND, J. (concurring).

I concur with the views expressed by Mr. Justice ELIAS HANSEN in his concurring opinion.

CHERRY, C. J. (dissenting).

I dissent. The information, while perhaps containing surplus matter, alleges all of the essential elements of embezzlement. The evidence produced by the state amply established the guilt of the accused. There was positive and convincing proof that on or about the 30th day of April, 1926, when the prosecuting witness, Janie Smith, entered into the contract for the sale of her real property to Bestelmeyer, she directed that the principal payments, which by the contract were payable to the real estate company, should be paid in satisfaction of the Cluff mortgage of $2,500 to

which both Clayton and Heal agreed. That they did not do so, but converted the money to the use of the corporation, was admitted and proved.

The salient facts in the case are that Clayton and Heal personally committed or knowingly participated in all the acts which constitute the crime charged, and that during all the times in question Clayton and Heal were the managing officers of the Provo Consolidated Real Estate Company and owned all of its outstanding capital stock except 10 shares thereof, which were held by Heal's wife. The stock book of the corporation was put in evidence, showing a complete record of the issuance and transfers of capital stock since its organization. On and after October 21, 1924, the outstanding capital stock of the corporation consisted of 4,259 shares, of which Clayton owned 1,419 shares, Heal 2,830 shares, and Heal's wife 10 shares. There were no other stockholders.

The fact that the acts constituting the crime charged were committed by the accused persons as officers of a corporation, does not lessen their guilt or protect them from punishment. It would be a reproach to law and a travesty of justice to exempt from legal punishment a person who commits acts in the name or through the medium of a corporation, which, if committed in his own name, would be felonious and criminal. Such a proposition is opposed to establish law. A corporation is an intangible abstraction, and is incapable of committing a crime where intent is involved. It can only act through its officers. If a felony is committed in the name of the corporation by its officers, such officers are individually liable. It is their criminal act, and not that of the corporation. *State* v. *Ross*, 55 Or. 450, 104 P. 596, 106 P. 1022, 42 L. R. A. (N. S.) 601, 613.

"The act of an officer of a corporation in committtting embezzlement is personal and not official, and he is subject to the same responsibility for such an act done by him through the instrumentality of the corporation as though it were accomplished by any other means." 20 C. J. 457.

"The officers of a trust company whose acts result in the conversion of funds deposited with it, where accessories are punishable as principals, have been held to be indictable therefor. So, too, the officers and directors of a company who permit the conversion of special deposits are personally liable for such act of embezzlement, and the fact that they act for its benefit and not for the benefit of themselves, in wrongfully converting a fund will not relieve them from liability to punishment under an embezzlement statute." 9 R. C. L. 1285.

In *Milbrath* v. *State*, 138 Wis. 354, 120 N. W. 252, 131 Am. St. Rep. 1012, a prosecution for embezzlement, the fourth syllabus is:

"In a criminal prosecution the accused cannot be heard to say in justification that he committed the offense in his official capacity as officer of a corporation, nor can he assert that acts in form corporate were not his acts merely because carried out by him through the instrumentality of a corporation which he controlled and dominated and which he employed for that purpose."

To the same effect is *Brown* v. *State*, 3 Ohio App. 52, 21 Ohio Cir. Ct. (N. S.) 545.

In *People* v. *Sherman*, 133 N. Y. 349, 31 N. E. 107, 108, the manager of a corporation having possession of grain belonging to another in its elevators was held properly convicted of larceny, where he without authority caused the grain to be transferred from one elevator to another, falsified his accounts to conceal his action, and sold the grain and put the proceeds in his bank account as manager of the corporation and applied the same on the corporation liabilities. The court said:

"The offense is described as within the second subdivision of section 528 of the Penal Code, and the claim now made is that the grain was in the custody and control of the elevator corporations, and not in that of the defendant. The section itself obviates the difficulty. It assumes that beneath the technical legal control of the corporation as such lies an actual and effective custody and control of corporate officers and servants. They are specifically desribed, and the fact in this case corresponds with the description. The corporation, as such,—the technical legal entity,—cannot suffer

imprisonment for a crime, but those who represent it and act for it as its officers and agents can. The defendant, as general manager, had the custody and control of the grain in the elevators. It was by means and by force of that very custody and control that he was enabled to shift the grain to sell and convert it, and confuse and falsify the accounts. It is of little utility to carry our inquiry back of the terms of the Penal Code, when the offense charged and proved is clearly within it."

In *State* v. *Thomas,* 123 Wash. 299, 212 P. 253, 33 A. L. R. 781, the first syllabus reads:

"A president who is general manager of a corporation engaged in lending money and selling securities is guilty of larceny if he participates in a transaction by which money due on a security which has been sold to a client is placed to the credit of the corporation's bank account when it is paid in by the borrower at a time when the corporation is in financial difficulties, so that the money is lost to the client."

Following this case in 33 A. L. R. 787, is an annotation entitled, "Individual criminal responsibility of officer or employee for larceny or embezzlement, through corporate act, of property of third person." In introducing the annotation, the annotator says:

"There is no dissent in the decisions which have passed on the question, from the conclusion that an officer or employee of a corporation may be held criminally responsible for the embezzlement or larceny of the property of a third person through a corporate act, where the act was done by the individual officer, at his direction, or by his permission." Citing numerous cases.

These authorities abundantly sustain the convictions under review, with respect to the relationship of the parties concerning the funds embezzled. The defendants personally committed the acts constituting the offense charged, and their guilt is personal, not corporate. They were the owners of substantially all of the stock of the corporation, and employed the corporate form as a medium for their individual purposes, thereby justifying the courts in disregarding the corporate form. *Milbrath* v. *State,* supra. The case is with-

in the letter of the statute. Comp. Laws Utah, 1917, § 8307. There is naught in this section limiting guilt to the embezzlement of corporation funds or property. It extends to the fraudulent appropriation of *any property* which any officer has in his possession or under his control by virtue of his trust. Under the view most favorable to the defendants, they had the custody and control of the money in question, by virtue of being corporate officers. *People* v. *Sherman,* supra. The cases herein cited are practically all where the property or money of third persons were embezzled or stolen by corporation officers.

The case of *Weber* v. *State,* 190 Wis. 257, 208 N. W. 923, 45 A. L. R. 928, cited by Mr. Justice STRAUP, does not support his position, because the facts therein were essentially different from those in the cases at bar. The Wisconsin court expressly distinguished the case cited on account of its peculiar facts, and recognized and approved its previous decision in *Milbrath* v. *State,* supra, which sustained a conviction upon facts which in all essentials were like those in the cases before us. The two instructions alluded to by Mr. Justice Straup present no contradiction or inconsistency, or any defect of proceedings available to the defendants. The first one quoted submits the question of whether or not the defendants agreed to apply the money in question in payment of the Cluff mortgage. This fact was affirmed by the state's evidence and denied by the defendants. The second instruction referred to a similar dispute of fact concerning an asserted agreement by the prosecutrix to permit the use of her money by the defendants in consideration of the payment of interest thereon. Both questions were necessarily decided by the jury adversely to the defendants for which there was ample support in the evidence.

I also disagree with the opinion of Mr. Justice ELIAS HANSEN and his version of the evidence. To warrant this court in substituting its judgment for that of the trial court and jury, upon the evidence and facts in the case, in my

opinion requires a showing of admitted facts far more definite and satisfactory than is presented by the record here.

Notwithstanding the trial court submitted to the jury whether Janie Smith had consented to the use of the money in question by the defendants for interest paid or credited to her and the jury after hearing the evidence found that she had not, it is asserted as grounds for reversal, that the testimony of Janie Smith conclusively establishes such consent and precludes a conviction for embezzlement.

While much is said concerning a "running account" and "the course of business" between the parties, the essential facts in the case are plain and simple. Janie Smith, a woman plainly unlettered and unskilled in business practices, in January, 1924, through the agency of the defendants, who were acting in the name and through the medium of a corporation, negotiated a loan of $2,500 from Harvey Cluff, which she secured by a mortgage upon her farm. The defendants represented both borrower and lender. The proceeds of the loan were not paid to Mrs. Smith in a lump sum. Payments were made by defendants to her and to others upon her order for the greater portion of the loan, but a small amount thereof was retained by the defendants and credited to Mrs. Smith on their books. From such credits and other small sums paid to the defendants by Mrs. Smith the defendants paid the interest periodically on the Cluff mortgage. In April, 1926, Mrs. Smith sold her farm to Margaret Bestelmeyer for $8,000 upon deferred payments of principal and interest. The defendants negotiated the sale for which they were paid a commission. By the contract of sale, the purchase price, both principal and interest, was payable to the defendants' company. After a sum in excess of $2,500 principal had been paid on the contract of sale, this controversy arose.

Mrs. Smith claimed and testified that when her farm was sold she directed and the defendants agreed that the payments made by the buyer to them as principal should be

paid on the Cluff mortgage until it was paid in full. In this she was corroborated by other evidence, and the jury was fully warranted in so finding. The defendants paid nothing on the principal of the Cluff mortgage, but appropriated the moneys collected to the uses of the corporation, under whose name they were acting, and afterwards failed in business, so that the money was lost to Mrs. Smith. The defendants denied that they had agreed to apply any of Mrs. Smith's money received by them on the Cluff mortgage, but asserted that there was an understanding that they could use such funds for their own purposes by paying interest thereon at 8 per cent per annum. Before the trial they prepared and furnished to Mrs. Smith a statement of account, purporting to show in detail, the transactions had with Mrs. Smith. The account consists of 1½ pages, and shows the receipt by defendants' company of the proceeds of the Cluff loan, and the payments made by Bestelmeyer, and a few other small sums paid in by Mrs. Smith, together with periodical credits of interest on balances on the credit side, and on the debit side shows the sums paid out on account of Mrs. Smith, including the amount of the Cluff mortgage. The account was introduced in evidence by the state, obviously as an admission that the defendants had received the money or check described in the information. The account was not questioned concerning the amounts received and paid out by the defendants, except as to the Cluff mortgage. Of course the credits for interest on balances due Mrs. Smith were challenged by the state, and the original ledger account of the real estate company was produced, which showed no corresponding credits for interest, except one or two made at the bottom of the account, after this controversy arose.

The defendant Clayton admitted that early in the year 1929, when pressed by Mrs. Smith for the payment of the Cluff mortgage, he executed and delivered to her a receipt dated back to May 8, 1928, reciting the receipt of $2,500 on the Bestelmeyer contract "paying mortgage to Harvey Cluff in full." Clayton further testified that interest in

favor of Mrs. Smith was first credited July 3, 1924, and from then on she was to receive credit for interest on balances at quarterly periods. Defendants did not claim that any money was ever paid to Mrs. Smith as interest.

The case is ruled by two of my associates, upon the proposition that Mrs. Smith admitted the receipt of interest upon balances of her money in the hands of the defendants. And a portion of her testimony on cross-examination is quoted as supporting such admission. When the whole of Mrs. Smith's testimony and other established facts are considered, I think it plain that she made no such admission. The cross-examination quoted and relied upon is in itself confused and unintelligible—the replies to questions ambiguous and unresponsive—unless viewed in the light of the situation and of other facts. The witness was a simple, unlearned woman. The record shows that she was ill during the trial, for which reason the hearing was suspended on one occasion. She had been subjected to a long and gruelling cross-examination. The matter referred to by the questioner had not been previously mentioned in the case. It is plain that the witness did not understand the questions accurately and accordingly did not answer them. That she understood the reference to interest as the money paid as such by Bestelmeyer is attested by every reply made. The replies are inconsistent with any other understanding by the witness. It must be remembered that the payments on the Bestelmeyer contract consisted of definite payments of principal and interest. Mrs. Smith invariably insisted that the payments of principal were directed and agreed to be applied in payment of the Cluff mortgage, leaving the interest payments for her use. She positively denied receiving interest before she sold her farm which was in 1926, although the defendant Clayton later testified the arrangement was made and interest credited two years before. She further testified that after the sale, "I drew interest on my money;" "the interest was supposed to come to me;" "I drawed interest along-some;" "I was supposed to receive

the interest and the principal was supposed to be turned to them." Under all of the surrounding circumstances, can there be any doubt that the witness had in mind and referred to the interest paid by Bestelmeyer?

But any doubt or ambiguity of her replies to the questions propounded on the cross-examination quoted was removed when she was recalled in rebuttal and testified that she never authorized the use of any money paid as principal by Bestelmeyer for any purpose other than to pay the Cluff mortgage. She was not cross-examined on this statement. The supposed admission is not only groundless in itself, as I have tried to show, but it is in conflict with the whole attitude and conduct and interest of Mrs. Smith. It is clear from the record that she was anxious to have the mortgage paid so she could keep her contract with Bestelmeyer, and that she repeatedly pressed the defendants about it, and that they led her to believe it was being paid, and finally gave her a receipt calculated to deceive her and make her believe it was paid. From the whole of the evidence of Mrs. Smith, it seems to me a perversion of the record to say that she conclusively admitted that she had consented to the use of her money by defendants and knowingly accepted credits of interest therefor.

It is said that the moneys in question were handled by the defendants in the same manner as other moneys of Mrs. Smith which came into their hands. This is true only so far as depositing the money in the bank to their own credit is concerned. They did not fraudulently appropriate to their own use all of Mrs. Smith's money. They accounted to her for a part of it. She was defrauded out of $3,500 only according to the evidence. But neither depositing the money in the bank to the credit of defendants or the failure to pay the Cluff mortgage amounted to embezzlement. Either fact would be good evidence tending to establish the crime, but both could be consistent with innocence. Had the money been retained, available to the owner, there could be no embezzlement. The gist of the offense is the fraudulent ap-

propriation of funds by one to whom they have been intrusted, so that they are lost to the owner, and this essential fact was expressly proved in these cases by evidence that one of the defendants in the presence of the other told Mrs. Smith that they had collected her money and spent it and had not paid her mortgage and asked what was she going to do about it.

In my opinion there is no valid reason for reversing the judgments, and both should be affirmed.